**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

Cesar A. Barturen, Raymundo Lara Molina,
Miguel Eduardo Tabara, Marco Antonio
Corona, Juan Carlos Molina, Julio Cesar
Moreno Gonzalez, Pedro Hernandez
Hernandez, Julio Antonio, Julio Carbonel,
Eusebio Santos Ferrosqullo, Jason Borges,
Limo Martinez, Juan Jose Pena Farfan,
Jose Fernandez, and Jorge Legis Cuyate
Carmona on behalf of themselves and all
other employees similarly  situated as class
and collective representatives,

**DECLARATION OF**
**DAVID B. RANKIN**

**07 Civ. 8127 (Stanton, J.)**

                    **Plaintiffs,**

     **- against -**

Wild Edibles, Inc., 535 Third Avenue
LLC, d/b/a Wild Edibles, Richard
Martin, and Jonathan Meyer,

                    **Defendants.**

---

        I, David B. Rankin, declare under penalty of perjury the foregoing is true and

correct, pursuant to 28 U.S.C. § 1746, as follows:

1.        I am the attorney for the above named Plaintiffs.  I submit this Declaration in

support of the Plaintiffs' Motion for a Preliminary Injunction.

2.        The relief sought is necessary to prevent Defendants from continuing their

unlawful campaign of retaliation against Plaintiffs – a campaign having the effect of

chilling Plaintiffs' continued participation in this lawsuit and intimidation of potential

Plaintiffs and witnesses from coming forward.

## Individual Terminations of Named Plaintiffs

3.        The affidavit of Plaintiff Raymundo Lara-Molina is attached as exhibit 1.  Mr. Lara-Molina was fired from Wild Edibles, Inc. ("Wild") on August 17, 2007 after attending a union meeting where overtime payment was discussed.  Mr. Lara had never been paid overtime.  One of his pay stubs is attached as exhibit 2.  Mr. Lara was fired for being a few minutes late to work. (Exhibit 1, ¶10)  He was only a few minutes late and had never been talked to about being late before in his almost two years of employment with Wild. (Exhibit 1, ¶4, 9)

4.        The affidavit of Plaintiff Jason Borges is attached as exhibit 3.  Mr. Borges was fired on August 20, 2007 immediately after making a demand for overtime pay. (Exhibit 3, ¶9)

5.        The affidavit of Plaintiff Raul Lara Molina is attached as exhibit 4.  Mr. Molina was terminated by Wild on August 30, 2007.   Subsequent to Mr. Molina missing a day of work he was suspended for a day by Richard Martin. (Exhibit 4, ¶7)  During his day of suspension, he was told by Luis Carbonel he was fired at Richard Martin's direction.  (Exhibit 4, ¶7)  The normal shop practice if a worker missed a day of work was to have that person at most suspended for a day. (Exhibit 4, ¶7, Exhibit 8, ¶15, Exhibit 9, ¶19-20)

6.        On information and belief, Mr. Carbonel and Richie Rice have the authority to grant employees leave and act as management's agent.

7.        The affidavit of Plaintiff Marco Antonio Corona is attached as exhibit 5.  Mr. Marco Antonio Corona suffered a variety of retaliatory treatment following the August 20, 2007 demand for overtime pay, including the withholding of lunch breaks, verbal

abuse, and extended working hours.  Mr. Corona left Wild due to the highly offensive

working conditions on September 14, 2007.

### The Temporary Restraining Order of September 20, 2007

8.　　　No notice was given to counsel as required by this Court's Order of

September 20, 2007 which is attached as exhibit 6.  The Order states as follows:

> In the meantime, I'm issuing a temporary restraining order until that
> further meeting next week against the defendants, their agents, and
> employees and all persons acting in concert with them, enjoining them
> from taking any adverse employment action or terminating the
> employment of any plaintiff or other employee, any other present
> employee, for the bringing of this action or for asserting a claim under the
> Fair Labor Standards Act claim.  In other words, a claim that his or her
> salary does not comply, salary and payments does not comply with that
> act.
>
> I think there is sufficient in the record to justify that injunction
> against violating an existing and clearly understood law.  For that reason,
> I'm not going to require the posting of any bond because I do not discern
> any impact and none has been suggested by defendants from following
> that.
>
> Now, if there is just cause for terminating an employee or taking
> an adverse employment action against an employee for reasons not
> connected with the assertion of a Fair Labor Standards Act claim, the
> defendant should of course be free to do that, subject to whatever the
> NLRB thinks about it.  <u>Therefore, I'll ask you to give plaintiffs' lawyer
> notice that such an action is contemplated and a day or so to respond if he
> thinks that it violates the Fair Labor Standards Act.</u>  I'm not interested in
> any other acts that he thinks may be violated by it.  That is subject to other
> remedies.  In other words, I'm not going to get into the NLRB or other
> situations.  I'm strictly keeping it to the assertion of the NLRB claim and
> retaliation for that assertion.  Does that leave anything unclear to
> anybody?
>> Mr. Howard:   I just have one question.
>> The Court: Sure.
>> Mr. Howard: If there is a matter of health and safety.
>> The Court: Yes.
>> Mr. Howard: Concerning an employee.
>> The Court: Yes, or violence.
>> Mr. Howard: <u>Yes.  I would ask that we be permitted to suspend the
>> employee and notify the plaintiffs' counsel and not have to bring him back
>> to work the next day under those circumstances.</u>
>> The Court:  Any objection?

Mr. Rankin: No objection.
The Court: so ordered.
…
The Court: I am taking the time and place for next Friday simply out of the calendar.  If it turns out you want more time, get in touch with my chambers.  We have to have something to shoot at and I'm shooting at that because I know I can do it regardless of how this other trial occupies me.  Anything else?
Thank you, gentlemen, we are adjourned until then and that restraining order is in effect just as though a written order had been signed and served.  It is an oral but binding order issued by a federal judge and it will be honored.
Mr. Howard:  <u>Fully understood your Honor.  We'll advise the client.  Thank you, your Honor.</u>
(Pages 19:20 – 21:22, *Emphasis Added*)

### <u>The Termination of Lino Martinez</u>

9.       The affidavit of Plaintiff Lino Martinez is attached as exhibit 7.  Mr. Martinez was fired on September 26, 2007.

10.       I informed Defense counsel on the morning of September 26, 2007 this firing had taken place by leaving a message in Mr. Bianco's voice mail.

11.        A conversation, that I again initiated, between the attorneys in the late afternoon indicated that defendants' position is that Mr. Martinez had abandoned his job.

12.       On September 25, 2007, Mr. Martinez informed Ritchie Rice through Miguel Antonio "Lalo" Tavera that he was sick and wanted to go home, affidavit of Miguel Antonio "Lalo" Tavera attached as exhibit 8.  Mr. Rice gave Mr. Martinez permission to go home.  (Exhibit 7, ¶¶ 5, 12; Exhibit 8, ¶¶ 5 - 10)

13.       On September 25, 2007, after Mr. Rice was informed, Mr. Martinez personally informed Luis Carbonal he was sick and wanted to leave.  (Exhibit 7, ¶13)

14.       Mr. Carbonal also gave Mr. Martinez permission to leave. (Exhibit 7, ¶13)

15.        On September 26, 2007, Mr. Martinez returned to work at his given start time at 2:00 am and punched his time card.  Ritchie Rice saw Mr. Martinez and told him there was "no more work for you." (Exhibit 7, ¶14)

16.        Ritchie Rice goes on to tell Mr. Martinez the order for his firing came from Richard Martin, the owner of Wild Edibles, Inc. (Exhibit 7, ¶14)

### The Termination of Jose Antonio Fernandez Tavara

17.        Plaintiff Mr. Jose Antonio Fernandez Tavara ("Fernandez") was fired on October 8, 2007; his affidavit is attached as exhibit 9.

18.        Again, I informed the defendants' counsel of this adverse employment action.

19.        On Sunday, October 7, 2007, Mr. Fernandez was not feeling well and called Wild at 10:00 pm to explain he would not be coming in for his shift on Monday morning. No one answered and he left a message.  (Exhibit 9, ¶29)

20.        Mr. Fernandez was worried and got up around 5:00 am and again called. Again, no one answered the phone and he left a message saying he would be in on Tuesday. (Exhibit 9, ¶29)

21.        Monday at noon Mr. Fernandez received a call from his brother, Eduardo Tavara, stating that Luis Carbonal told him Richard Martin said Mr. Fernandez no longer has a job at Wild. (Exhibit 9, ¶30)

### Other Terminations

22.        On October 1, 2007, I received an email from Plaintiffs' counsel stating Rodney B. Askins had been fired, or in counsel's words "abandoned his job," after two days of not calling in or showing up to work.  This email is attached as exhibit 10.  This email also noticed counsel that another employee had been fired.  Leonardo Flores had

been terminated, or in counsel's words "abandoned his job," as the result of a final warning and again not calling and not showing up for work.

23.        Again, I received no advanced notice of these adverse employment actions.

## Previously Submitted Affidavits and Ancillary Issues

24.        The Industrial Workers of the World filed a National Labor Relations Board charge against Wild, this charge is attached as exhibit 11.  Wild's charge against the Industrial Workers of the World is attached as exhibit 12.

25.        I am not counsel for any of the following, the Industrial Workers of the World, Brandworkers, Inc., or Daniel Gross.  Defendants' counsel has been told this repeatedly.

26.        The Affidavit of Plaintiff Cesar Barturen is attached as exhibit 13.

27.        On information and belief, Mr. Barturen has been falsely accused of stealing products from Wild.  Additionally, on information and belief, on at least one occasion last week, Mr. Barturen had a monitor working for Wild drive in his delivery truck for the purpose of creating a pretextual reason for his termination.  Mr. Barturen continues to be deprived of the assistance he received prior to the commencement of this action. (Exhibit 13, ¶¶20, 21)

28.        I declare under penalty of perjury the foregoing is true and correct.


_____

David B. Rankin

## AFFIDAVIT OF RAYMUNDO LARA-MOLINA

State of New York )

: ss

County of New York )

I, Raymundo Lara-Molina, state the following to be the truth under the penalties of perjury:

1. My name is Raymundo Lara-Molina. I live at 32-32 105 St. 2 Fl., East Elmhurst, NY 11369.

2. I worked at Wild Edibles from November 2005 to August 17, 2007.

3. While working at Wild Edibles I was always paid by the week, not hourly. I never received any overtime or hourly pay. When I started working for Wild Edibles I was paid $450 a week by check before taxes. By the time I was fired I was paid $475 a week, by check, before taxes.

4. In almost two years of working for Wild Edibles I had never had any trouble with the management. I worked hard, and was complimented for my hard work.

5. While I worked hard for Wild Edibles I was bothered by the fact that we did not receive overtime pay, and that we did not receive any benefits.

6. On August 11, 2007 I attended a Union meeting with the Industrial Workers of the World to discuss with fellow workers the possibility of demanding overtime pay from Wild Edibles, as well as the possibility of getting benefits.

7. At the meeting was a man named Martin, who appeared to record some of the proceedings with his cell phone. He was never at any subsequent worker meetings. Martin is very

1

friendly with the management at Wild Edibles, and it seems likely to me that he may have told Richard Martin about our meeting.

8. I believe Richard Martin found out about the possibility of our making overtime demands, and of my involvement in the meeting.

9. I was very rarely late for work, and normally only by a few minutes. I had never been warned about being late or working slowly.

10. On August 17, 2007 I was fired from Wild Edibles. I was told that it was for being late and for working slowly.

11. I believe I was fired because Richard Marin found out about the Union Meeting and he wanted to discourage workers from demanding their overtime rights.

12. I have since retained David Rankin to demand the overtime pay to which I am entitled but was never paid.

*Raymundo Lara Molina*

Raymundo Lara-Molina

Sworn to before me this

11th day of October 2007

GEOFFREY S. STEWART
Notary Public, State of New York
No. 02ST4978267
Qualified in Kings County
Commission Expires 2/25/11

2

| Employee Info # | Employee Name | | | | Soc. Sec. # | Voucher No. 12856 | Company Name & Address WILD EDIBLES INC. |
|---|---|---|---|---|---|---|---|
| 1147 | RAYMUNDO LARA MOLINA | | | | | | WILD EDIBLES, INC. |
| Loc # WILDEDLIC | Div # PE20 | Dept.# 30 | Clerk # 1147 | | | | 21-51 BORDEN AVENUE LONG ISLAND CITY, NY 11101 |
| Branch Num | Period Ending | Check Date | FW= | M 5 | | | |
| 7 / 16 / 07 | 7 / 22 / 07 | 7 / 27 / 07 | ST= | M 5 | | | |

| EARNINGS | | | | | TAXES | | | DEDUCTIONS | | |
|---|---|---|---|---|---|---|---|---|---|---|
| DESCRIPTION | HOURS | RATE | AMOUNT | YTD | DESCRIPTION | AMOUNT | YTD | DESCRIPTION | AMOUNT | YTD |
| REGULAR | 1.00 | $375.00 | $375.00 | $13,660.50 | SSEC | $23.25 | $846.95 | | | |
| | | | | | MEDI | $5.44 | $198.08 | | | |
| | | | | | SWTNY | $5.40 | $269.93 | | | |
| | | | | | LOCNYCRES | $3.47 | $178.74 | | | |
| | | | | | SDINY | $0.60 | $18.00 | | | |

| EARNINGS | $375.00 | TAXES | $38.16 | DEDUCTIONS | $0.00 | NET PAY | $336.84 |
|---|---|---|---|---|---|---|---|

WILD EDIBLES INC.
WILD EDIBLES, INC.
21-51 BORDEN AVENUE
LONG ISLAND CITY, NY 11101

**VOUCHER DATE**
7 / 27 / 07

**VOUCHER NO.**
12856

**DEPOSIT**    THIS IS NOT A CHECK

RAYMUNDO LARA MOLINA
32-32 105TH STREET
APT 2FL
EAST ELMHURST, NY 11369-2518

Bank T/R # 221472815

Bank Account 8310267738

Deposit Amount $336.84

Description Checking

VOUCHER - NON NEGOTIABLE

FORM NLRB-5106
(1995 - JW)

County of Kings              )          Case No(s). 29-CA-28497
State of New York            )

## AFFIDAVIT

I, **Jason Borges**, being first duly sworn upon my oath, hereby state that I have been given assurances by an agent of the National Labor Relations Board that this affidavit will be considered confidential by the United States Government and will not be disclosed unless it becomes necessary for the government to produce the affidavit in connection with a formal proceeding.

---

My address is 7451 64th place, Glendale, New York, 11385

My telephone number is (347)227-7148

I was employed by Wild Edibles located at 21-51 Borden Avenue, Long Island City, NY 11101

1.  I first began working for Wild Edibles on August 20, 2006. The Employer sells and delivers seafood to restaurants, hotels and gourmet groceries. The Employer has fish cutting employees who begin work at around 2:30 a.m. who prepare the seafood for delivery. The Employer also employs about 12 drivers who deliver seafood in vans to its customers. I was employed as driver. I worked Monday, Thursday and Friday from 5:30 a.m. to approximately 3:00 p.m., Tuesday and Wednesday from 6:00 a.m. to 3:00 p.m. or 4:00 p.m. I was assigned to deliver seafood to Westchester, Connecticut and New Jersey. I earned a salary of $450 per week. I also worked on Saturdays and received $75 cash for working this day. There were no other benefits provided by the Employer.

2.  The Employer is owned by Rich. Robert Blayer was my supervisor. He had an assistant, Waty, who was the head driver. There was also a salesman Matt, who was a supervisor. Bobby is the supervisor of the fish cutters. The Employer also owned 3 retail stores. I was hired by Robert Blayer. I walked into Long Island City facility and asked about a job. Blayer interviewed me and took a copy of my license. Later that week, Blair called me and offered me the job.

3.  Sometime in July 2007, I do not recall the exact date, when I was leaving the Employer's Long Island City facility at the end of my shift, I saw who I later learned was Alex from IWW, Industrial Workers of the World. Alex came up to me and asked if I worked for Wild Edibles. He asked how I was treated and if I received benefits. I told him that we did not receive benefits. He said, so you work and don't get benefits. I said yea. Alex said that he worked for a group called IWW and they were a Union. He said that they were going to

represent the workers at Wild Edibles and help us get benefits. He said that he knew that we worked overtime and did not get paid for it. After a short conversation, I left. On another day, I met Billy Randel. Randel and Alex regularly stood in front of the facility and spoke to the employees. I believe that they were there on almost a daily basis. I know that Waty saw me speaking to Alex.

4. On a Saturday in late July 2007, the Union had a meeting at a park in Corona. Myself and 1 other driver and about 10 warehouse employees attended this meeting. There were a few people from the Union there. The Union discussed organizing the Employer.

5. On I believe August 18, 2007, I spoke to Alex. Alex told me that the Employer had fired a fish cutter, Reymundo. Alex said that we were going to have to do something and we were going to march in on Monday at 1:30 a.m. On August 20, 2007, I went to work at 1:30 a.m. There were several people from the Union including Billy, Alex and Dan. There were about 12 warehouse employees standing in front of the warehouse. I was the only driver present. The Union had a big banner IWW banner that took 4 workers to hold. There were also signs in Spanish. When a garbage truck and tuna delivery truck came, we marched in front of the entrance and they drove away. Soon after I arrived, I saw the fish cutting supervisor Bobby. At around 3:00 a.m., we were standing across the street from the rear of the building when Matt the salesman supervisor pulled up in his car. He took a camera with a big lens out of his car and took pictures. He told us, "say cheese" and "smile". Soon after, the owner Rich pulled up in his car and got out. He looked at us and began walking to the building. A Union rep asked him if he wanted to negotiate and he said no and went in the building.

6. At some point that morning we saw some employees from the Employer's retail stores go into the warehouse. These employees never go to the warehouse and I assumed that they were there to do our jobs. At some point supervisor Robert Blayer arrived at work. We then saw the supervisors prepare the vans for deliveries. Sometime before 5:30 a.m., Rich and Robert came out to speak with us. We were standing across the street from the warehouse. Rich approached the Union guys and we gathered around. Rich said that he would never allow a union come into his business. He said that he would never let anyone interfere with his business. He said that he despised unions. Rich said that he did not like the way unions work and he would not let them try and run the show and he would never let it happen. Rich then said to the workers, how can you do this to me, I treat you like my brothers. He then pointed to different workers and said, I lend you money and you and you. He was angry and went back inside.

7. At around 5:30 a.m., Rich and Robert stood outside again. They observed me as I approached the arriving drivers and asked them to not go into work and

stay with me. About 3 or 4 drivers told me that they would stay with me. Rich came closer to us and asked the drivers how they could do this to him and said that he treated them like brothers. Soon after, I saw Rich whispering to each of the drivers who said that they would stay outside with me. Each one of these drivers then went into work and I was the only driver outside.

8. Soon after. Rich came out to the group of employees and Union people and said that he wanted to meet inside with 4 men and talk about what it would take for us to return to work. We decided that I would go in with 3 fish cutters. We went into the office where Rich, Robert, Waty and Matt were present. When we went into the office, Rich looked at me and asked what it would take for us to return to work. I said that I didn't want to do this but we needed benefits and to be paid for overtime. Rich said to me, I am not in the position to meet your demands, get your little bag and come back next week and pick up your check. ( I had placed my bag with my clothing on the floor at the meeting). I then picked up my bag and said to Rich, thanks for treating me with respect, and walked out. I said this because he always claims that he treats the employees with respect.

9. When I went outside, I told everyone that I had been fired. Billy Randel asked me if I was sure. I said that I was. Randel went into the warehouse. When he came out, he said that the boss said that Jason had quit. I then went back into the warehouse. I went up to Robert and asked if I could speak with him. Rich then was present. I asked Rich if he said that I quit. Rich yelled, quit or fired, it doesn't fucking matter, your not going to get anything but unemployment so get the fuck out." Rich yelled at me in front of all the other drivers and people working in the warehouse.

I have requested and received a copy of this affidavit.

I have read this statement consisting of _3_ pages, including this page. I fully understand its contents, and have made any additions or corrections necessary to correct any errors of text. I swear it is true and correct to the best of my knowledge and belief, this 13th day of September, 2007.

/s/ Jason Borges

Subscribed and Sworn to before me at Brooklyn, New York, this 13th day of September, 2007.

/s/ James P. Kearns, Board Agent
National Labor Relations Board

## AFFIDAVIT OF RAUL LARA MOLINA

1. My name is Raul Lara Molina. I live at 147-10 41st Avenue, Flushing, NY.

2. I worked for Wild Edibles three times. The first time was for five months and the second was for 2 or 3 months, but I do not remember the dates. The final time, I worked for 1 year and 3 months. I started in the summer of 2006 and finished in August of 2007.

3. I ordered lobsters and weighed and cut fish.

4. I was paid $450 before taxes. They paid me for about 51 hours of work.

5. I started to work at 2 a.m. and left at 12 noon on Monday and Friday. On Tuesday, Wednesday and Thursday, I worked from 2 a.m. until 11 a.m. and Saturday I worked from 4 a.m. until 9 or 10 a.m. This was the last schedule. Before I worked different hours, but I always worked about 50-55 hours.

6. Supposedly, each year we get one week of vacation. The first year, we get one week of vacation and after working for 2 years, we get two weeks. I only worked for one year, so I only had a week of paid vacation.

7. I missed work two times and I did not call. Other times I had and excuse and there was no problem. I missed work on Thursday, August 30, and the owner, Richard said that I was suspended for Friday and because I knew that I was suspended on Friday, I did not go. I spoke with Luis Carbonel, the floor manager, by telephone and he told me that that owner said that I did not have to come any more because I was fired.

8. When other people missed work, nothing happened. Sometimes other people were suspended, but nothing more than that.

9. Before the demand for overtime and the union action, I had good relationships with the owner and the people who worked for the business. When the workers asked the owner for raises, the owner always said that business was bad.

10. The first time I spoke with the union representatives, we talked about work, how many hours we work, representatives, and how much the business paid us. I began talking with the union about 2 months ago to improve my well-being.

11. We talked about the protest on August 20 for 15 or 20 days. We started it at 2 in the morning. At first, the owner arrived at about 4 in the morning and entered the store without talking to anybody. Afterwards, he left and Billy told the owner that he wanted to talk and the owner said no. Then Billy told him that we wanted to be paid overtime, to be respected and that we wanted new gloves and aprons and the owner said no, that we were paid by salary and afterwards Billy told him that

he wanted to go inside. The owner said that nobody could tell him what to do with his business. Billy also told the owner to reinstate my brother, Raymundo and the owner said no. Billy and the owner talked more, but I do not know what they were talking about. We stayed outside until 8 in the morning. The owner spoke with Christino and Cesar, drivers, and Jose, a fish cutter and the owner said that Raymundo could return, but after a month. They said to the owner what it is we wanted and the owner said that we could enter the building and that he would speak with us one by one, but only spoke with some of us, not all. He told us that when we had worked for one year, he would give us raises.

12. The put another manager on, but there were not changes in the work. The owner never talked with the workers like he told us was going to do.

## AFFIDAVIT OF RAUL LARA MOLINA

I, Raul Lara Molina, prometo decir la verdad, y esto es lo que testifico:

1. Mi nombre es Raul Lara Molina. Yo vivo en el 147-10 41st Avenue, Flushing, NY.

2. Yo trabajé para Wild Edibles tres veces. La primera vez era por 5 meses y la seguna vez era por 2 o 3 meses, pero no recuerdo las fechas. La ultima vez, trabajé por un año y 3 meses. Empecé en el verano de 2006 y terminé en agosto de 2007.

3. Yo hacía las ordenes de langostas, pesaba pescado y cortababa pescado.

4. Me estan pagando 450 antes de que quiten taxes, me pagan trabajo como 51 horas por semana.

5. Empezaba a trabajar a las 2 a.m. y salía a las 12 noon el lunes y viernes. El martes, miercoles y jueves, trabajaba de 2 a.m. hasta las 11 a.m. y el sábado, trabajaba de 4 a.m. hasta 9 o 10 a.m. Este era el ultimo horario. Antes, trabajé horas diferentes pero siempre trabajar como 50-55 horas.

6. Supuestamente, cada año, tenemos una semana de vacación. El primer año, tenenos una semana de vacación y después de trabajar por dos años, tenemos dos semanas de vacación. Yo solamente trabajé por uno año y por eso solamente tenía una vacación de una semana pagada.

7. Falté el trabajo dos veces y no le llamé have cuatro meses. Otras veces tenía una excusa y no había problema. Falté trabajo el jueves, el 30 de agosto, y el dueño Richard dijó que estaba suspendió por el viernes y el viernes porque yo sé que estaba suspendió no fui. Hablé con Luis Carbonel, el manager de piso, por teléfono, y el me dijó que el dueño dijó que ya no fuera más porque me despidió.

8. Cuando otras personas faltan el trabajo, no pasan nada. A veces otras personas fueran suspendían, pero nada más que eso.

9. Antes de la demanda por overtime y la acción del sindicato, tenía relaciones buenas con el dueño y las personas que trabajan por el negocio. Cuando los trabajadores preguntaban que el dueño aumenta el salario, el dueño siempre decía que el negocio es malo.

10. La primer vez que hablé con los representatives del sindicato, hablamos de trabajo, cuantas horas trabajamos representativos y cuanto nos pagaban el negocia. Hace como 2 meses que hablé con el sindicato por el bienestar de nosotros.

11. Hablamos de la protesta el en 20 de agosto por 15 or 20 días. Empezamos a las 2 de la mañana. Al principio, el dueño llegó como a las 4 de la mañano y entró la tienda pero no habló con nadie. Después salio y Billy le dijó al dueño que quería hablar y el dueño dijo que no. Despues otra vez volvió a salir y no dijó nada y volvió a meterse. Despues Billy le dijo que nosotros queremos que pagara por tiempo extra y que tuvieran respeto con nosotros y nos dieron guantes y delantales nuevos y el dueño dijó que no y el dijó que pagan por sueldo y después Billy dijó que quería entrar el negocio. El dueño dijó que nadie le iba a decir a el que el lo que hacer con su negocio. También Billy le dijó el dueño que le regresa al trabajo mi hermano, Raymundo y el dueño dijó que no. Billy y el dueño hablaban más pero no sé de que estaban hablando. Nos quedabamos a fuera hast alas 8 de la mañana. El dueño habló con Christino, y Cesar, los drivers y Jose, un filetero y el dueño dijó que regresar a Raymundo pero después de un mes. Ellos dijeron al dueño lo que queremos nosotros y el dueño dijo que entraramos al entrar a trabajar y que iba a hablar con nosotros uno por uno, pero solo habló con unos, no todos. El les dijo que hasta que cumplir un año, les iba a aumentar.

12. Nos pusan otro manager, pero no habían cambios en el trabajo. El dueño nunca habló con todos los trabajadores como el nos dijo que estaba hacer.

*Raul Lara Molina*
Raul Lara Molina

Sworn to before me this
14th day of October 2007

Notary Public- Stephanie Morin Taylor, ESQ.
State of New York, Kings County
Reg. No: 02TA6170747, Exp. 7/16/2011

**AFFIDAVIT OF BETH BALTIMORE**

**STATE OF NEW YORK**        )
                             :
**COUNTY OF KINGS**          )

    Beth Baltimore, being sworn, says:

    I have volunteered to translate for David Rankin, Attorney at Law.  I am fluent in Spanish and English. I have read the foregoing Spanish language document and the accompanying English language document, The Affidavit of Raul Lara Molina. The English document is a complete and accurate translation of the Spanish document.

_____
Beth Baltimore

Sworn to before me this
_16_ day of _OCT._ 2007

_Paulette M. Thielman_

Notary Public

PAULETTE M. THIELMAN
Notary Public, State of New York
No. 01TH5082638
Qualified in Kings County
Commission Expires July 28, 2009

# AFFIDAVIT OF MARCO ANTONIO CORONA

I, Marco Antonio Corona, promise to tell the truth, and this is what I testify:

1. My name is Marco Antonio Corona. I live at 96-04 41st Avenue, Corona, NY 11368.

2. I worked for Wild Edibles two times. The first time was in September 2002 until December 2004. The second time I worked from April 2007 until September 2007.

3. I started work at 2 a.m. and left at 12 noon Monday and Friday. On Tuesday, Wednesday and Thursday, I worked from 2 a.m. until 11 a.m. and on Saturday, I worked from 4 a.m. until 9 or 10 a.m. This was my last schedule. Earlier I worked different hours but I always worked about 50 – 55 hours.

4. The first time I was paid $355 by check and $45 cash. After one and a half years I received a raise of $20 or $25, which I was paid in cash. This last time I was paid $400 and not given cash.

5. I weighed fish and did the scallops orders and took inventory of the fish. I also took out the garbage and fillet the fish.

6. This time I left in September 2007.

7. It was because we were in the union. I left because they pressured us. There were air conditioners in the room I was in. They turned them on and it did not matter that we were working in the cold. I could not put anything in my throat because the air was so cold.

8. Of the abuses that there were: They wanted us to deliver the inventory before lunch and if we did not deliver it, they took away lunch in order to finish the inventory. Also, they took away lunch to load the trucks. Bobby, who buys the fish, said to us, "Fucking Mexicans, you are such slow workers." He threatened us that if we did not deliver the inventory before lunch that he would tell the boss to fire us.

9. When Bobby insulted us, Richie would laugh at the insults that Bobby said to us. One time Bobby said that before we came to this country, we should have learned English and we do not have a right to be in this country.

10. When Richie entered, he told us to hurry up and that we were very slow workers and now, ultimately, it would be passed to the manager. Richie always watched us so we would not talk and would only work and if we went to the bathroom, he took the time and if we took too long, he would take down the time and tell the boss. He would tell the boss everything we would do.

11. Robert did not like for us to leave on time. He gave us things to do so that we could not leave on time. On one occasion, it was 10 minutes before 12 and 2 of my co-workers and I went to check our card. We were supposed to be done at 11. When we checked the card, it was 10 minutes to 12. Robert asked us what we were leaving if the other co-workers were still inside and that we should all leave together. But, the others, 3 of them were new and they were explaining to them the job they had to do and we were no longer doing it. Then, this was what Robert claimed was the reason we had gone first. Robert called a woman to translate more things. She told us that Robert had said that we could not leave first. Then, I told her that it was 50 minutes past the time we were supposed to finish. Robert told us that this was not important and that we had to leave together. And also when we arrived at the beginning of our shift, 2 or 3 minutes late, he marked our card, he put a mark that signified, "late," on our cards. He told us that the next time, we would be fired. Robert also turned on the air and it did not matter that we were inside.

12. I left because of all of this pressure and because I cannot stand the air. One example of the air is that Linares, a co-worker, got sick because Robert and Richie turned on the air and it did not matter who got sick.

## AFFIDAVIT OF MARCO ANTONIO CORONA

Yo, Marco Antonio Corona, prometo decir la verdad, y esto es lo que testifico:

1. Mi nombre es Marco Antonio Corona. Yo vivo en 96-04 41st Avenue, Corona, NY 11368.

2. Yo trabajé para Wild Edibles dos veces. La primera vez era en el septiembre 2002 hasta el diciembre de 2004. La seguna vez, trabajé de april de 2007 hasta el septiembre de 2007.

3. Empezaba a trabajar a las 2 a.m. y salía a las 12 noon el lunes y viernes. El martes, miercoles y jueves, trabajaba de 2 a.m. hasta las 11 a.m. y el sábado, trabajaba de 4 a.m. hasta 9 o 10 a.m. Este era el ultimo horario. Antes, trabajé horas diferentes pero siempre trabajé como 50-55 horas.

4. La primera vez me estan pagando $355 en el cheque y me daba $45 en cash. Después de un año y media me aumentó $20 o $25 y me pagaba an cash. Esta ultima vez, me pagaba en el cheque $400 y no me daba cash.

5. Yo pesaba pescado y hacía los ordenes de los escalops y hacía inventario de pescado. También sacaba la basura y filetiaba.

6. Esta vez, salí en septiembre de 2007.

7. Era que los estabamos en el sindicato. Me salii porque ellos nos precionaban Donde y oestaba en el cuarto, había Cooling airconditioners. Lo prendían y no les importaba que nosotros trabajando en el frío. No me dejaba con ponerme la garganta por lo frío de aire.

8. De los abusos que habían: Nos desean que tenemos que entregar el inventario antes de ir al lunch y si no le entragabamos, nos acaban de lunch para que terminaramos el inventario. También, nos acaban de lunch para cargar las camionetas. Bobby, el que compraba el pescado, nos decía "Fucking Mexican, son muy lentos para trabajar. Nos amenczaba que si no entragabamos el inventario antes de lunch que le iba a decir al patron para que nos corriera."

9. Cuando Bobby nos decía groserias, Richie sereía las groceries que Bobby nos decía. Una vez Bobby dijó que antes de venir a esta paía, teníamos que aprender ingles y nostros no tenemos ningún derecho en esta país.

10. Cuando Richie entraba, nos decía que nos apurarmos y que estabamos muy lento en el trabajo y ahora lo que ultimamente que lo pasarón al manager. Richie siempre nos miraba para que nosotros no platicaramos y solo trabajaramos y si ibamos al baño, el nos tomaba el tiempo y si nos tardabamos, nos tomaba el tiempo y les decía al patron. Todo lo que hacíamos le decía al patron.

11. Robert no le gustaba que saliramos a nuestra hora de salida. El nos ponía hacer cosas para que no salir a la hora de salida. En una ocación, eran 10 para las 12, yo y dos de mis compañeros de trabajo a chequar nuestra tarjeta. La hora de salida eran las 11. Cuando nosotros chequando la tarjeta eran las 10 para las 12. Robert nos dijó que porque nosotros nos estamos saliendo si los demas compañeros están al dentro que todos tenían que salir juntos. Pero como, los demás, 3 de ellos eran nuevos y solo les estaban explicando el trabajo que tenían que hacer y ya no estaban trabajando. Enconces, eso fue lo que nos reclamó Robert que porque nosotros ibamos primero. Robert llamó a una muchacha para que nos traduciera más cosas. Ella nos dijó que Robert nos decía que no podíamos irnos primero. Entonces, yo le contesté que eran 50 minutos que nos habíamos pasado de la hora de salida. Robert dijó que eso no le importaba y que tememos que salir todos juntos. Y también cuando nosotros llegabamos a la hora de entrada, 2 o 3 minutos tarde, nos marcarba la tarjeta, nos ponía un marcado que significa, "late." Robert nos amenezaba cuando nosotros teníamos un pequeño error. Nos decía que para la próxima, nos corría. Robert también nos prendía el aire y no le importaba que estuvieramos alli adentro.

12. Yo me sali por todos esas presiones y que no aguante el aire. Una prueba del aire es que Linares, un compañero de trabajo, se enfermó porque Robert y Richie prendían el aire y no les importaba quien se enfermara.

_Marco Antonio Corona_

Sworn to before me this
14th day of October 2007

Notary Public- Stephanie Morin Taylori ESφ.
State of New York, Kings County
Reg No: 02TA6170747 Exp. 7/16/2011

## AFFIDAVIT OF BETH BALTIMORE

STATE OF NEW YORK      )
                             :
COUNTY OF KINGS        )

      Beth Baltimore, being sworn, says:

      I have volunteered to translate for David Rankin, Attorney at Law. I am fluent in Spanish and English. I have read the foregoing Spanish language document and the accompanying English language document, The Affidavit of Marco Antonio Corona. The English document is a complete and accurate translation of the Spanish document.

_Beth Baltimore_
Beth Baltimore

Sworn to before me this
_16_ day of _OCT._ 2007

_Paulette M. Shelman_
Notary Public

PAULETTE M. THIELMAN
Notary Public, State of New York
No. 01TH6082638
Qualified in Kings County
Commission Expires July 28, 2009

79K3BARC                      Conference

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   BARTUREN,

4                       Plaintiff,

5               v.                              07 CV 8127 (LLS)

6   WILD EDIBLES, INC., et al.,

7                       Defendants.

8   ------------------------------x
                                                New York, N.Y.
9                                               September 20, 2007
                                                5:00 p.m.
10
    Before:
11
                        HON. LOUIS L. STANTON,
12
                                                District Judge
13
                              APPEARANCES
14
    DAVID B. RANKIN
15       Attorney for Plaintiff

16  MELTZER LIPPE
         Attorneys for Defendants
17  BY:   THOMAS J. BIANCO
          RICHARD M. HOWARD
18

19

20

21

22

23

24

25

79K3BARC                        Conference

1          (In open court)

2          THE DEPUTY CLERK:  Plaintiff ready?

3          MR. RANKIN:  Yes.

4          THE DEPUTY CLERK:  Defendants ready?

5          MR. HOWARD:  Yes.

6          THE COURT:  Before we start, let me apologize to all

7    of you for keeping you waiting.  Can you hear me in the back?

8    Is that better?  Okay.

9          I was just apologizing for keeping you waiting because

10   this was scheduled for 4 o'clock, and I'm sure you were here at

11   four.  But I was tied up in another matter, which is going to

12   trial, presently scheduled for trial Monday morning.  And we

13   had some preliminary matters that had to be discussed and that

14   have some complexity, so that conference ran over until --

15   well, you probably saw them coming out.  10 minutes or so ago.

16   And I spent the other time reading the defendant's papers which

17   came in in this case.  So I'm sorry you were kept waiting.  But

18   it isn't because I was playing screen games or reading the

19   newspaper.  It's for the reasons I've stated.

20          Anyway, I'll hear you now.  Mr. Rankin.

21          MR. RANKIN:  Good afternoon, your Honor.  Thank you so

22   much for agreeing to hear us on such short notice.  First of

23   all, I'd like to kind of characterize this case.  I mean, what

24   we have here is a group of low income workers who have been

25   forced to work between 50 and 75 hours a week.

79K3BARC                    Conference

1        I understand this hearing is on retaliation.   I'll

2    move to that very, very rapidly.   I wanted to characterize what

3    at base we are dealing with.

4        What I am going to do is I am going to go through

5    basically their arguments they submitted in their papers, and

6    then I am going to present the evidence that I think we are

7    drawing your attention to from the papers.

8        First of all, plaintiffs, point one in their

9    memorandum of law indicates that the failure to file a formal

10   FSLA complaint with either the Court or the United States bars

11   the retaliation.   This, your Honor, is not our interpretation

12   of the law for a number of reasons.   First of all, we need to

13   look to the case, the leading case on this in the Second

14   Circuit, which is *Lambert*.   The *Lambert* case starts off -- the

15   *Lambert* case factually is a situation where a worker complains

16   that they are not getting paid enough.

17        THE COURT:   Look, in this case, you claim that certain

18   workers have already been fired for making complaints about

19   their hours and pay; is that correct?

20        MR. RANKIN:   That is correct.

21        THE COURT:   Then I think we can talk about this case.

22        MR. RANKIN:   That would be fabulous.   I'd like to turn

23   to this case.   The first instance of this notice would be

24   definitely on the 20th when the workers went in and met with

25   the owner of the shop, and demanded overtime pay.   Said we need

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

79K3BARC                    Conference

1   some overtime pay.  That did not happen.  No overtime pay was

2   given, and subsequently very shortly thereafter an individual

3   was fired.  Another individual two days later was fired who was

4   at that very same session demanding the overtime pay.

5   Subsequently to that there was a third individual fired and

6   then a fourth individual fired.

7               THE COURT:  Why were they fired?

8               MR. RANKIN:  The reason that we are submitting to your

9   Honor is because they participated in this demand activity on

10  the 20th.  And the employer knew who these people were.

11              THE COURT:  What was their participation?

12              MR. RANKIN:  My understanding is their participation

13  was sitting -- there are a few individuals that went in to talk

14  to the owner, Mr. Richard Martin.  And there were other

15  individuals who were outside of the shop with some signs.

16              THE COURT:  What did the signs say?

17              MR. RANKIN:  The signs were union signs, your Honor,

18  talking about overtime and talking about the union.  So we have

19  those actions.

20              I think it's important to note that this shop, my

21  understanding, has about 40 people in the warehouse.  Between I

22  think it was between 30 and 50 people in the warehouse.  We

23  have a full five individuals out of that number that have

24  suffered some employment activity.  That's about an eighth of

25  the shop that has been disciplined in some manner or has been

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

79K3BARC                    Conference

1    constructively discharged.   Which is obviously a very large

2    number.   And these workers, quite honestly, your Honor, are

3    very -- they are scared.  You can see how seriously they take

4    it by the fact we have such a great showing here, here this

5    evening.

6              As to the notice issue, I'd like to continue on that

7    for just a moment.   It is our contention that under the New

8    York labor law there is a much more permissive standard for

9    what notice requires.

10             THE COURT:   We are talking about notice to whom?

11   Saying what?

12             MR. RANKIN:   That would be notice to the employer,

13   your Honor, that they would like to have their overtime pay.

14   If I could read you the section of the New York labor law that

15   is New York Labor Law Section 215, sub 1, shall discharge,

16   penalize or in any other manner discriminate against any

17   employee because such employee has made a complaint to his

18   employer.   Much more permissive than the FSLA cases.  I contend

19   that *Lambert* is satisfied here because *Lambert* doesn't actually

20   go into what the formal complaint is required.  But I think it

21   bears noting under the New York labor laws the degree of notice

22   is much, much more permissive.   And if I could go then to --

23             THE COURT:   Your jurisdiction here is based upon the

24   Fair Labor Standards Act?

25             MR. RANKIN:   Yes.

79K3BARC                          Conference

1            THE COURT:  You do not have diversity jurisdiction.

2            MR. RANKIN:  No, we do not, your Honor.

3            THE COURT:  How does the New York labor law come into

4    it?

5            MR. RANKIN:  Well, the New York -- it's obviously a

6    federal question under the FSLA.  If I could get the argument

7    on the FSLA about the -- my understanding, obviously you'll

8    correct me if I'm wrong, if we have a cognizable claim for the

9    injunction -- I obviously contend that *Mitchell* does not -- we

10   do we have notice under *Mitchell*, given as *Mitchell* says --

11   doesn't say what exactly you need to say.  It only says that

12   what is not sufficient notice is when you have a general

13   allegation and a non-specific complaint.  The *Mitchell* case was

14   a claim that was based on someone's gender.  And the actual

15   complaint said I need more money.  So that doesn't tell us what

16   we need.  It just tells us what we don't need.  But I submit to

17   your Honor that because this claim is --

18           THE COURT:  What is the language of the Fair Labor

19   Standards Act with respect to a retaliation?

20           MR. RANKIN:  One moment, please.  I apologize, your

21   Honor.

22           THE COURT:  It may be in your brief.

23           MR. RANKIN:  Yes.  Here we go.  It is indeed Section

24   15(a)(3).  The Fair Labor Standards Act makes it unlawful for

25   any person to discharge or in any other manner discriminate

1 │ against any employee because such employee has filed any

2 │ complaint or instituted or caused to be instituted any

3 │ proceeding under or related to this chapter or has testified or

4 │ is about to testify in any such proceeding.

5 │        THE COURT:  And the defendant's position is that you

6 │ served the complaint with the papers.

7 │        MR. RANKIN:  That is their position.

8 │        THE COURT:  It wasn't a preexisting complaint.

9 │        MR. RANKIN:  Well, I mean we have the notice --

10 │        THE COURT:  Leaving the NLRB proceedings to one side.

11 │        MR. RANKIN:  We can discuss that at a separate point.

12 │ It's our contention that all *Mitchell* does -- or excuse me, all

13 │ *Lambert* does is say what is not a permissible type of

14 │ complaint.  Clearly, when you have workers coming to you as an

15 │ employer demanding overtime pay, and you know you are not

16 │ paying them overtime, that there is a reasonable inference that

17 │ there is going to be some subsequent action from that.  I think

18 │ that any employer would have at least constructive notice that

19 │ that would be coming down at them.

20 │        Again if I could turn to the language under the New

21 │ York labor law, and there is two Eastern District cases I'd

22 │ like to turn your attention to that have dealt with this issue

23 │ that I think might be informative in the matter.  The first one

24 │ is *Warden v. Squibb*, that's 480 F.Supp. 203.  Under Section 215

25 │ an employer is prohibited from discharging, penalizing, or in

1   any other manner discriminating against an employee because the

2   employee has complained to the employer or the industrial

3   commission about a violation of labor law.  That's again

4   *Squibb*.  That case.

5           There's also *DiMarzio*, that's 200 F.Supp. 2d. 151.

6   Again it's in the Eastern District.  That's in 2002.  That

7   stands for essentially the same proposition.  There is

8   precedent in using the New York labor law to show what type of

9   notice is required for this retaliation.

10          Next, your Honor, I'd like to go to the issues of

11  preemption that have been raised in defendant's brief.  I would

12  first like to go to the case of *Barrentine*, a Supreme Court

13  case from 1981.  That's 450 U.S. --

14          THE COURT:  Tell me first the principle of law for

15  which you're arguing.

16          MR. RANKIN:  This principle of law, your Honor, is the

17  preemption issue.  Indicating that because there is an NLRB

18  proceeding, that therefore somehow precludes this action.

19          THE COURT:  You say it does not?

20          MR. RANKIN:  That's our position, yes.

21          THE COURT:  For what reasons?

22          MR. RANKIN:  For the reasons that there is an entirely

23  separate right of action, and specifically, the NLRB is

24  designed for collective action.  For union activity.  Whereas

25  the FSLA is designed specifically for individual plaintiffs.

79K3BARC                    Conference

1   And in fact bars unions from coming in and asserting FSLA

2   claims on behalf of their members.  If I may, this is again

3   referring to *Barrentine*.  In sum, the FSLA rights petitioner

4   seeks to assert in this action are independent of the

5   collective bargaining process.  They defined petitioner as

6   individual workers, not as members of a collective

7   organization.  They are not waivable.  Because Congress

8   intended to give individual employees the right to bring their

9   minimum wage claims under FSLA in court, and because these

10  congressionally granted FSLA rights are best protected in a

11  judicial rather than arbitral form.

12          This shows I think fairly clearly that we have on the

13  one hand issues with the NLRB's dealing with and obviously has

14  much expertise in dealing with unfair labor practices.  That's

15  not what we're arguing about here.  What we're arguing about

16  here is that the basis that the complaints for the federal

17  failure to pay overtime caused retaliatory employment

18  decisions.  Whether or not in part and parcel to those

19  complaints there was some union activity involved which

20  obviously from the affidavits and the briefs is no doubt

21  clearly present.  However, that does not in some way subsume

22  the FSLA complaint.

23          THE COURT:  What are the issues before the NLRB?  Are

24  they representation issues or do they have to do also with

25  rates of pay?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

79K3BARC                      Conference

1          MR. RANKIN:  Your Honor, I really don't know.  The

2   most I've read --

3          THE COURT:  That's a good answer.

4          MR. RANKIN:  From the defendant's brief that came in

5   this afternoon.

6          THE COURT:  Okay.

7          MR. RANKIN:  And the affidavit that I have in my

8   paper.  That's really what I know about them.

9          THE COURT:  All right.

10          MR. RANKIN:  So I wish I could be -- maybe defense

11   counsel.

12          THE COURT:  We are trying to get to the point.

13          MR. RANKIN:  Thank you, your Honor.  What could I do

14   to facilitate that?

15          THE COURT:  Let your adversary speak.

16          MR. RANKIN:  Okay.

17          THE COURT:  Mr. Howard.

18          MR. HOWARD:  Thank you, your Honor.  I am not sure

19   exactly where I should begin.  There are a number of

20   deficiencies we are dealing with in this matter.  Fact is, that

21   the *Lambert* case that counsel pointed to says quite

22   specifically complaints made to a supervisor are not

23   sufficient.  That's all that they've alleged at best in this

24   case, is complaints made to a supervisor.  I can't swear to the

25   two cases cited by counsel, but my recollection is --

79K3BARC Conference

1            THE COURT: Supposing what you characterize as a

2    complaint is in fact a request for payment in accordance with

3    the Fair Labor Standards Act?

4            MR. HOWARD: That would be insufficient.

5            THE COURT: Because it's oral?

6            MR. HOWARD: Because the only way that you could frame

7    a retaliation claim under the FSLA is if there's been a

8    complaint to a District Court or if there's been a complaint to

9    the Department of Labor.

10           THE COURT: But then for today's purposes from here on

11   out, a discharge for assertion of the Fair Labor Standards Act

12   claim would be retaliatory under the act, correct?

13           MR. HOWARD: If that was the motivation, certainly.

14           THE COURT: Yes. A discharge next Wednesday, for

15   bringing this case.

16           MR. HOWARD: Would be retaliatory and subject to the

17   act. No question.

18           THE COURT: Yes.

19           MR. HOWARD: And the act provides a remedy and

20   provides a cause of action for same. The fact is, that the act

21   doesn't provide a remedy before the action is commenced or

22   before there is a complaint to the Department of Labor. That's

23   number one.

24           THE COURT: But by remedy you are saying what? What

25   do you mean by remedy when you say --

79K3BARC                        Conference

1         MR. HOWARD:  Reinstatement, payment of back pay,

2    attorneys' fees.  These are all permissible remedies under the

3    FSLA.

4         THE COURT:  Okay.  Compensatory and punitive remedies

5    for the act.

6         MR. HOWARD:  Certainly.  The reality in this case is

7    it's rather clear this was union organizing activity.  My

8    understanding that certain of the people sitting in the

9    courtroom right now are not employees of Wild, but rather are

10   employees of the International Workers of the World.  Why would

11   they be here unless it was for their concerted activity.  And

12   that union organizing or concerted activity is what is before

13   the National Labor Relations Board, and what's before there is

14   an unfair labor practice charge for retaliation for union

15   sympathy.  For union activities, union organizing.

16        So we are going to go into the National Labor

17   Relations Board, they are going to say that's why you

18   retaliated against us.  We are going to go to this Court and

19   say that's why you retaliated against us.  In reality maybe

20   someone was discharged because someone was late 20 times out of

21   30 in one month.  Maybe someone was discharged because they

22   didn't show up for work.  Maybe someone wasn't discharged but

23   two people quit.

24        I hear the term "constructive discharge," which means

25   a standard in this circuit of conditions that are so

79K3BARC                          Conference

1    unreasonable, so egregious, no human being should be forced in

2    a civilized society to have to exist with same.  If these

3    people could continue working this long until the union came

4    along to tell them they were in bad conditions, those

5    conditions didn't exist to reach the level of a constructive

6    discharge, which is beyond harassment, which is beyond the

7    bounds of human decency.  That's the law.  We are not

8    approaching constructive discharge, yet you hear the words

9    bandied about because people quit and they want to find a

10   reason to pin that on the employer.

11           The reality is that the defendant does not claim

12   preemption to the NLRA.  The defendants cites the doctrine of

13   primary jurisdiction.  This Court has concurrent jurisdiction,

14   we don't say otherwise, under the doctrine of primary

15   jurisdiction.  I respectfully submit that the Court should

16   permit the NLRB to deal first with any issue of retaliation it

17   already has before it.  Mr. Kearns, the board agent on this

18   case, notarized one of the affidavits presented to this Court

19   alleging such retaliation by Mr. Borgis who asserts he was

20   fired, asserts certain facts that are contradicted by the union

21   organizer Mr. Randall in his affidavit to this Court.

22   Contradicted rather specifically in terms of who was invited in

23   as compared to who walked in of their own volition.

24           We have a situation here where allegedly, as I read

25   the affidavit, someone asked my client will you negotiate with

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

79K3BARC                        Conference

1   us.  Which would be an unlawful act.  You can't negotiate with

2   the union before it's been recognized.  Before the employees --

3   that is the purpose of the NLRA, to provide for free choice of

4   the employees.  Until they have visited that through an

5   election, an employer who recognizes a union -- this isn't a

6   prehire, it's not permissible before there is a certified

7   election.  The employer would be committing an unfair labor

8   practice.  It's done so we don't have sweetheart unions coming

9   in.  You can't negotiate with the union in advance.

10           Particularly on point in this particular case, your

11  Honor, is we turn to the issue of the interim relief requested,

12  which this circuit just very recently ruled makes no sense in

13  the case at bar.  Because the chilling effect that they are

14  trying to avoid and it's people are afraid.  With all due

15  respect, if you are afraid you don't show up.  If you are

16  afraid, you're not here in force to try to intimidate other

17  people.  If you are afraid, you hide.  People aren't hiding.

18  They are sitting here.  That's not exactly a great example of

19  fear in my own mind.

20           Going back to what I was saying, your Honor.  Second

21  Circuit just recently ruled in the *Lucier* case that's been

22  provided to the Court, and it follows a long line back from

23  *American Postal*, and I've cited the other cases that are on

24  point.  That where you talk about the interim relief to stop

25  someone from being discharged, it doesn't provide the relief in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

79K3BARC                                    Conference

1    question to stop the chilling effect.

2                 THE COURT:   A chilling effect on what?

3                 MR. HOWARD:   A chilling effect -- I expect what is

4    being said to this Court, if they are allowed to fire someone,

5    you'll have a chilling effect on people's willingness to join

6    the collective action, or people's willingness to join the

7    union.   I am not sure which action takes precedence in this

8    case, but whichever it is.   That's what it appears to be.

9    Otherwise what is the purpose of preliminary injunctive relief

10   in this case.   It's not to avoid someone -- we know the law,

11   long settled, that merely because someone may lose income if

12   they are discharged is not a grounds for preliminary

13   injunction.   It's not irreparable harm.   It's solved by

14   monetary damages.   Which is well settled.   That's an action in

15   law.   You don't need equitable relief where anything is

16   resolved by monetary damages.   There is no right to injunction

17   because there is no irreparable harm.

18                 The only way there could be a preliminary injunction

19   in a discharge situation would be if there was the chilling

20   effect that I was discussing.   And the circuit, various other

21   courts as cited in the papers have set forth that's not

22   sufficient for a preliminary injunction.   Because it doesn't

23   have the desired effect.   It's only a permanent injunction at

24   the end of the action that might have that effect.   The interim

25   relief would be ineffective.

79K3BARC                        Conference

1            Aside from that, we have absolutely diametrically

2     opposed apparently statements of fact in this case.  Which

3     avoids any likely success of the merits.  And we have said in

4     no uncertain terms, Mr. Martin has said in no uncertain terms,

5     he hasn't discharged anyone because of their participation

6     either in union organizing or this action.  This action which

7     was learned of yesterday, excuse me, Monday, at about 5 p.m.

8     He didn't discharge anyone because of either.  He said in no

9     uncertain terms and has set forth whether people resigned, were

10    fired, etc.  Some of the named plaintiffs in this action were

11    fired almost two years ago.  Or severed from employment on

12    whatever basis almost two years ago.  We have people, as I've

13    stated, and it's set forth in the papers, with various very

14    good reasons for discharge.

15            Finally, your Honor, we are talking about someone

16    requesting that an employer notify the Court before discharging

17    an employee?  There is a remedy under the Fair Labor Standards

18    Act if a discharge is retaliatory.  With all respect, I've been

19    doing this a number of years, I've never seen anyone have to

20    call a federal judge before the discharge.  You do so at your

21    peril if you are doing it in a retaliatory fashion.  It's

22    rather unwise considering the remedies available to the

23    plaintiff.  To get the Court involved in the operation of a

24    fish purveyor seems a little absurd for judicial economy

25    purposes and it's inappropriate.

79K3BARC                        Conference

1      My client is bound by the Fair Labor Standards Act and

2   has no objection to proceeding in accordance with the Fair

3   Labor Standards Act.  The preliminary injunction allows people

4   unwarranted job security.  Two people have a fight.  One person

5   is severely injured.  Maybe one person is hitting another

6   person saying if you don't join the union I am going to beat

7   you harder.  He can't fire that person?  He has to allow him to

8   continue to beat up other employees until he calls the Court?

9   That would be rather absurd.  I respectfully submit to you it

10   is not warranted in the slightest.

11      Thank you, your Honor.  I'm sorry.  As has been

12   pointed out to me, the merits of this action, some of the

13   affidavits specifically point out to the fact that workers are

14   exempt, certain workers are exempt under the Fair Labor

15   Standards Act where someone says they routinely drive across

16   state lines, they are subject to the motor carrier exemption.

17   They are not even subject to the Fair Standard Labors Act.

18   They are exempt.  We understand that there to be a number of

19   drivers who are in exactly that situation.  And Mr. Borgis who

20   is the person who we have the distinction of whether he was

21   quit or fired was also such a driver.

22      Thank you again, your Honor.

23      THE COURT:  Thank you, Mr. Howard.  The case does

24   present at the present time the conflicts on the papers, and

25   the papers are very inadequate for the determination of the

79K3BARC                    Conference

1   questions involved.  And that is not a criticism of anybody who

2   prepared the papers.  It's inherent in the nature of the way

3   this issue came up on very short notice, and I gave very short

4   notice to the defendants because I wanted to get the question

5   resolved or at least articulated as soon as I could so it could

6   be addressed without delay.  And that's been useful I think.

7   But its usefulness is limited because the responses naturally

8   come with a great many gaps in them.

9           I think under the circumstances, the proper thing is

10  for me to adjourn this for a week.  And we can meet at really

11  the same time I think next Friday, not tomorrow, but a week

12  after, that will be Friday the 28th.  We can make it earlier.

13  I can hear you starting at 2:30 on Friday, September 28.

14          In the meantime, I'll tell you what should be done

15  between now and then.  There should be affidavits from each

16  individual who was claimed to have been fired in retaliation

17  for asserting a Fair Labor Standards Act claim.  There should

18  be affidavits from the individual defendants with respect to

19  those particular firings.  And there should be affidavits from

20  anyone who participated in the firing, addressed to the claim

21  that was asserted or wasn't asserted, and the nature of

22  discharge.  So, we have people under oath and with sufficient

23  knowledge of the facts that he or she is setting forth to be

24  subject to the penalties of perjury if the facts are misstated.

25          I also want from somebody with similar knowledge an

1    affidavit describing the nature of the issues and the

2    proceedings before the NLRB and the degree or absence of

3    overlap with the Fair Labor Standards Act issues in this case.

4    I would like those well in advance of the meeting on Friday so

5    that I have time to read them and think about them, and it will

6    make the meeting on Friday more useful.

7              Mrs. Thomas, who runs the courtroom, will give counsel

8    a form of order under Section 16(b) of the Federal Rules of

9    Civil Procedure to be completed by counsel with respect to,

10   well, it lists a lot of topics, and comply so you bring into

11   the meeting or give me before the meeting on Friday a 16(b)

12   order with respect to the process of this action.

13             I'm not concerned with the representation issues

14   before the NLRB.  They're properly before the NLRB but they do

15   not erase the Fair Labor Standards Act questions which may need

16   to be dealt with in this case.  I think that will allow us to

17   proceed with a little more knowledge and precision which is

18   what is lacking at the moment.  Not in the minds of counsel,

19   but in my mind.

20             In the meantime, I'm issuing a temporary restraining

21   order until that further meeting next week against the

22   defendants, their agents, and employees and all persons acting

23   in concert with them, enjoining them from taking any adverse

24   employment action or terminating the employment of any

25   plaintiff or other employee, any other present employee, for

79K3BARC                    Conference

1   the bringing of this action or for asserting a claim under the

2   Fair Labor Standards Act claim. In other words, a claim that

3   his or her salary does not comply, salary and payments does not

4   comply with that act.

5           I think there is sufficient in the record to justify

6   that injunction against violating an existing and clearly

7   understood law. For that reason, I'm not going to require the

8   posting of any bond because I do not discern any impact and

9   none has been suggested by defendants from following that.

10          Now, if there is just cause for terminating an

11  employee or taking an adverse employment action against an

12  employee for reasons not connected with the assertion of a Fair

13  Labor Standards Act claim, the defendant should of course be

14  free to do that, subject to whatever the NLRB thinks about it.

15  Therefore, I'll ask you to give the plaintiffs' lawyer notice

16  that such an action is contemplated and a day or so to respond

17  if he thinks that it violates the Fair Labor Standards Act.

18  I'm not interested in any other act that he thinks may be

19  violated by it. That is subject to other remedies. In other

20  words, I'm not going to get into the NLRB or other situations.

21  I'm strictly keeping it to the assertion of the NLRB claim and

22  retaliation for that assertion. Does that leave anything

23  unclear to anybody?

24          MR. HOWARD:  I just have one question.

25          THE COURT:  Sure.

79K3BARC                    Conference

1              MR. HOWARD:  If there is a matter of health safety.

2              THE COURT:  Yes.

3              MR. HOWARD:  Concerning an employee.

4              THE COURT:  Yes, or violence.

5              MR. HOWARD:  Yes.  I would ask that we be permitted to

6    suspend the employee and notify the plaintiffs' counsel and not

7    have to bring him back to work the next day under those

8    circumstances.

9              THE COURT:  Any objection?

10             MR. RANKIN:  No objection.

11             THE COURT:  So ordered.

12             MR. HOWARD:  Thank you, your Honor.

13             THE COURT:  I am taking the time and place for next

14   Friday simply out of the calendar.  If it turns out you want

15   more time, get in touch with my chambers.  We have to have

16   something to shoot at and I am shooting at that because I know

17   I can do it regardless of how this other trial occupies me.

18   Anything else?

19             Thank you, gentlemen, we are adjourned until then.

20   And that restraining order is in effect just as though a

21   written order had been signed and served.  It is an oral but

22   binding order issued by a federal judge and it will be honored.

23             MR. HOWARD:  Fully understood, your Honor.  We'll

24   advise the client.  Thank you, your Honor.

25             THE COURT:  Further briefing would be welcome also.

79K3BARC                          Conference

1    I'll read them.

2                                    o0o

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# AFFIDAVIT OF LINO A. MARTINEZ

1. My name is Lino Alberto Martinez and I live at 31-25 48th St., Basement, Long Island City, NY 11103.

2. I started working at Wild Edibles, Inc. on April 3, 2005 and I was fired on September 26, 2007.

3. My job was to cut and prepare fish and seafood.

4. My salary was $450.00 each week for the entire time I worked for Wild Edibles. It did not matter how many hours I worked in a week, the salary was always $450.00

5. On August 20, 2007 I arrived in front of the store where I worked at 20 minutes before 2 in the morning. At this time, I gathered with other co-workers to prepare to make the demands on Richard Martin, the owner of Wild Edibles. People had posters and announcements. Our union representative, Billy Randel, was also there. The co-workers I remember being there are Reimundo Lara, Juan Carlos Molina, Jose Fernandez, Miguel Antonio "Lalo" Tabera, Raul Lara, Pedro Hernandez, Jason Borges, Gary, Cesar Barturen, Julio Carbonel Dolores y Marcos.

6. At around 5 in the morning on August 20, 2007, Richard Martin approached the workers that were protesting. Billy Randel made the demand to Richard that Reimundo should be reinstated and that all of the workers should be paid overtime. Richard Martin said he did not want to know anything as a group, but he would meet with us individually.

7. At around 8 or 9 in the morning, my co-workers and I were still outside and decided to end the protest and return to work. A few minutes earlier, Jason Borges told us that he had been fired and he left.

8. One week after the protest, for the first time, the cooling system was set too cold in the warehouse while we were working and we complained to the supervisor that it was too cold.

9. Raul Lara was fired at the same time the fans started.

10. At the end of August Julio Cesar missed a day of work, a Saturday. Richard Martin never worked Saturdays, but this Saturday, Richard specifically came to work and told Julio Cesar that he was stupid and was fired the same Saturday.

11. On September 25, 2007, I started my shift as usual at 2 in the morning and was working only in my area. It was very cold, the cooling system was set at a very low temperature. Later my co-worker, Lalo, came to work in the station where I

was. He shut off the cooling system three times and three times Richie, the manager, came to turn it on again. He asked him why the machine had to be set and he told me that it was an order from Richard Martin.

12. At around 4:30 in the morning I didn't feel well. My head, neck and shoulder hurt. I had chills and my nose was running. I asked my friend and co-worker Lalo if he could tell Richie that I didn't feel well and I wanted to go home. I asked Lalo to tell Richie instead of telling him myself because I did not feel well and did not think that I could communicate well with Richie. He does not speak Spanish well and I do not speak English. Lalo's English is a little better.

13. Lalo entered the office and asked Richie if I could go home because I did not feel well. I looked at what happened though a window in the office. I saw that Richie made a movement with his hand indicating that I could leave. Lalo left and told me that Richard said it was okay. Then I went to tell the manager, Luis Carbonal that I did not feel well and was going home. He asked me if I had told Richie and I said yes. He told me that if I did not feel well, I should go home. I asked that if Robert, the manager above Richie, asked, to please tell him that I went home because I did not feel well. I asked if I should punch my timecard before I left and he said yes. I punched my timecard at 4:46 a.m. and I went home.

14. The next day, September 26, 2007, I punched my timecard to start my shift five minutes before 2 in the morning, changed into my work clothes and went to the office to fill out some stickers for the oysters and there Richie saw me and said to me, "Lino. There is no more work for you." I asked why and whether it was an order from Robert. Richie told me no. "Not Robert. Richard Martin. There is no more work for you." My co-worker, Carlos Molina, was there and I said to Carlos, Did you hear that? Richard Martin ordered my firing. Carlos answered that he heard. I told Richie okay, changed my clothes and said to Luis, the leader, that Richie told me I no longer worked for the company. Since I had already been fired and I still felt bad, Carlos Barturen helped me call an ambulance and they came for me.

# AFFIDAVIT OF LINO A. MARTINEZ

1. Mi nombre es Lino Alberto Martinez y vivo en 31-25 48th St #Basement Long Island City, NY 11103.

2. Comence a trabajar en Wild Edibles Inc el 3 de Abril del 2005 y fui despedido el 26 de Septiembre del 2007.

3. Mi trabajo era de cortar y preparar el pescado y mariscos.

4. Mi salario era de $450.00 por semana por todo el tiempo que trabaje para Wild Edibles. Trabajaba alrededor de 50 horas a la semana. No importaba cuantas horas trabajaba a la semana, el salario era de $450.00.

5. En Agosto 20 del 2007 yo llegue al frente de la tienda donde yo trabajaba, serian 20 minutos para las 2 de la manana. En este momento me reuni con otros companeros de trabajo y prepararnos para hacer demandas al dueno de Wild Edibles Richard Martin. La gente tenian cartelones y anuncios. Nuestro representante de la union Billy Randell estuvo tambien. Los trabajadores que yo me recuerdo que estaban ahi son Reimundo Lara, Juan Carlos Molina, Jose Fernandez, Miguel Antonio "Lalo" Tabaria, Raul Lara, Pedro Hernandez, Jason Borges, Gary, Cesar Barturen, Julio Carbonel Dolores y Marcos.

6. Como a las 5 de la manana el 20 de Agosto del 2007, Richard Martin se acerco a los trabajadores que estaban protestando, Billy Randel lo pidio a Richard que Raimundo regresara a su trabajo y que pagara overtime a todos los trabajadores. Richard Martin no queria saber nada como grupo, pero individualmente si trataria de hablar.

7. Como a las 8 o 9 de la manana yo y mis companeros de trabajo todavia estavamos afuera y decidimos terminar la protesta y regresar a trabajar. Unos minutos antes Jason Borges nos informo que habia sido despedido y se fue.

8. Despues de una semana de la protesta, por primera vez el sistema de enfriamento lo pusieron demasiado frio en el warehouse mientras estabamos trabajando, nos quejamos al supervisor que estaba demasiado frio.

9. Raul Lara fue despedido al mismo tiempo que los ventiladores empezaron.

10. A fines de Agosto Julio Cesar falto al trabajo un sabado. Richard Martin nunce trabaja los sabados pero este Sabado especifico Richard vino a trabajar y dijo que Julio Cesar era un estupido y fue despedido el mismo sabado.

11. El 25 de Septiembre del 2007 empeze a trabajar mi turno como siempre a las 2 de la manana estaba trabajando solo en mi area. Estaba muy frio, el sistema de

enfriamiento estaba muy bajo, mas tarde mi companero de trabajo Lalo vino a trabajar en la misma stacion que yo estaba. El apago el sistema de enfriamiento tres veces y por tres veces el manager Richie lo volvia a poner otra vez. Lo pregunte porque tenia que tener la maquina puesta y el me contesto que era orden de Richard Martin.

12. Como a las 4:30 de la manana no me sentia bien. Me dolia la cabeza, el cuello y mi brazo. Tenia escalofrios y se me delato la nariz. Le pedi a mi amigo y companero de trabajo, Lalo, si le podria decir a Richie que no me sentia bien y que me queria ir a casa. Le pedi a Lalo que le dijera a Richie en vez de yo decirle a Richie porque no me sentia bien y no pense que me podria comunicar bien con Richie. El no habla Espanol muy bien, y yo no hablo Ingles. El Ingles de Lalo es un poco major.

13. Lalo entro a la oficina y le pregunto a Richie si yo me podia ir a la casa porque no me sentia bien. Yo mire lo que paso por la ventana de la oficina. Yo vi que Richie hizo un movimiento con la mano indicando que me podia ir. Lalo salio y me dijo que Richie dijo que estaba bien. Luego yo fui a decirle al manager Luis Carbonel que no me sentia bien y que me iba a casa. El me pregunto si le dije a Richie, y le dije que si. El me dijo que si no me sentia bien, entonces deberia irme a casa. Yo le pedi que si Robert, el manager arriba de Richie, llagaba que porfavor le dijera que me fui a casa porque no me sentia bien. Le pregunte si deberia punchar la tarjeta de tiempo antes de irme, y me dijo que si. Punche la tarjeta a las 4:46 am y me fui a la casa.

14. El proximo dia 26 de Septiembre del 2007 yo ponche mi tarjeta de tiempo para empezar mi turno 5 minutos antes de las 2 de la manana, me cambia a mi ropa de trabajo y me fui a la oficina para llenar unas etiquetas para los ostros y alli me vio Richie y me dijo, "Lino. No mas trabajo para ti." Yo le pregunte porque, que si era un orden de Robert. Richie me contesto no, "No, Robert. Richard Martin. No mas trabajo para ti." Mi companero de trabajo, Carlos Molina, estaba alli y le dije Carlos oiste eso? Richard Martin ordeno mi depedida. Carlos me contesto que si lo oyo. Le dije a Richie que esta bien, me cambie de ropa y le dije a Luis el lider que Richie me dijo que ya no trabajaba en esta compania. Como ya me habian despedido y me seguia sintiendo mal, Cesar Barturen me ayudo a hablar a una ambulancia y vinieron por mi.

Lino Alberto Martinez

Sworn to before me this
27th day of September, 2007

Bruce A. Yerman
Notary Public, State of New York
No. 02YE5051510
Qualified in Nassau County
Commission Expires 12/20/2009

Peru National ID
2552213 6 A
(sworn in Spanish
via translator)

## AFFIDAVIT OF BETH BALTIMORE

| | |
|---|---|
| **STATE OF NEW YORK** | ) |
| | : |
| **COUNTY OF KINGS** | ) |

Beth Baltimore, being sworn, says:

I have volunteered to translate for David Rankin, Attorney at Law. I am fluent in Spanish and English. I have read the foregoing Spanish language document and the accompanying English language document, The Affidavit of Lino A. Martinez. The English document is a complete and accurate translation of the Spanish document.

*Beth Ball*

Beth Baltimore

Sworn to before me this
_16_ day of _OCT_ 2007

*Paulette M. Thielman*
Notary Public

PAULETTE M. THIELMAN
Notary Public, State of New York
No. 01TH5082638
Qualified in Kings County
Commission Expires July 28, _2009_

# AFFIDAVIT OF MIGUEL EDUARDO TAVARA

1. I am Miguel Eduardo Tavara.

2. 97-19 Alsynte Avenue, 2nd Floor, Corona, NY 11368.

3. My Job is to cut and prepare fish and seafood.

4. I started to work in December of 2002.

5. I asked a manager [referring to a company policy about leaving work early].

6. Lino Martinez left early on Tuesday, September 25.

7. Lino told me that his shoulder hurt a lot. It was cold and I turned off the fans and then Richie came and said that they always had to be working. Richie turned them on.

8. Lino asked me to tell Richie that he felt bad and wanted to go home.

9. I told Richie that Lino felt bad and wanted to go home.

10. Richie said that Lino could leave. Richie was annoyed with the questions. I did not think that there was anything strange. I believed that Richie had given permission to Lino.

11. The next day I heard that Lino was fired. Lino arrived at work on time and Richie told him that he no longer worked there. Richie said that it was an order from Richard Martin that Lino no longer worked for the company.

12. I was at the strike on August 20.

13. There are many differences in the workplace [since the strike]. The owner looks at us with a bad face, with another face. He makes us work faster. The fans were turned on and he put another manager on the night shift who checks on us every five minutes and makes us work with the fans on, which is very cold, and in a very cold room and before it was not like this. They only turned on the fans when we left work. The manager Richie told me to arrive before 2 a.m. to make the tickets and to punch my card 5 minutes before 2 a.m. and on Friday he made us call his office to show us our punch cards saying that we were arriving late and that we had to arrive 10 or 5 minutes before; if we punch in 2 minutes after 2 a.m., for him, we are already arriving late; then my brother Jose said that we were only arriving 2 to 5 minutes late, then Richie said that we had to arrive before 2 a.m. and he told us that we had to change our clothes and punch our cards, and that this was the first warning that he would give us and that if we continued to arrive late, we would be fired. On Friday, October 5, Richard Martin called all of the workers in the

building and told us in his office that he was very grateful for the union because it made him lose 5 clients and that these 5 clients made up 10% of his profits and that thanks to the work of the union he had lost this 10%. He said that because of how he had lost this 10% he was going to take 10%, and he told the new people that for 4 or 5 people that are in the union, that they should not be convinced to sign with the union since the union had offered greater benefits and many millions of dollars and that they are the majority, and that the union could not enter.

14. The fans were positioned to work a week after the strike. They made it much colder than normal.

15. When you missed a day and did not call, you were suspended for a day and did not get paid for the suspended day [before the strike].

16. They think that it is unjust [Lino's firing] because he arrived on time, completed his work and was a good worker. It could be because of many things – one for the union, another because of the fans, and the work with the lawyers.

17. We have double work because we have to teach the new workers and do our work and the work of the new workers.

18. It is very busy and I cannot leave before finishing work.

19. I have been paid overtime for two weeks.

# AFFIDAVIT OF MIGUEL EDUARDO TAVARA

STATE OF NEW YORK )
: ss:
COUNTY OF NEW YORK )

1. Yo soy Miguel Eduardo Tavara.

2. 97-19 Alstyne Avenue, 2nd Floor, Corona, NY 11368.

3. Mi trabajo es cortar y preparar el pescado y los mariscos.

4. Empezé a trabajar el diciembre de 2002.

5. Solo preguntar a un manager.

6. Lino Martinez salió temprano el martes, el 25 de septiembre.

7. Lino dijo que le duele bastante el hombro. Hacia frio y yo apagé los ventiladores y después vino Richie y dijo que siempre tenian que estar funcionandos. Richie los encendió.

8. Lino me preguntó que le dije a Richie que sentia mal y queria ir a su casa.

9. Dije a Richie que Lino sentia mal y que queria ir a su casa.

10. Richie dijo que se fuera Lino. Richie estaba molestado con las preguntas. No creo que era algo raro. Creo que Richie le ha da permiso a Lino.

11. Al día siguiente yo escuche que Lino fue despedido. Lino llegó trabajar a su hora y Richie le dijo que no iba a trabajar mas. Richie dijo que era un orden de Richard Martin que Lino no iba a trabajar mas en la compania.

12. Yo estaba en la huelga en el 20 de agosto.

13. Hay bastante diferencias. El dueno Richard los mira mal, con otra cara. Nos pone a trabajar mas rapido. Los ventiladores paran prendido y puso un manager en el turno noche en lo cual nos chequea cada conco minutos y nosh ace trabajar con el turno prendidos con todo eso y estando el cuarto frio y anteriormente eso no se hacia tan solamente se prendido los ventiladores cuando salimos de trabajo. El manager Richie me dijo que llegara antes para hacer tickets y que ponchara mi tarjeta 5 minutos antes de las 2 am y el dia viernes nos hizo llamar a sus oficina nos enserno enseno nuestra tarjeta de ponchar diciendo que nosotros estamos llegando tarde que teniamos que llegar de 10 a 5 minutos antes porque si

Ponchamos 2 minutos despues de las 2 am para el ya estamos llegando tarde, entonces mi hermano Jose dijo que solo estamos llegando a 2 a 5 minutos tarde entonces el dijo que nosotros teniamos que llegar antes de 2 am y nos dijo que teniamos cambiamos de ropa y despues ponchar nuestra tarjeta y que esta era capritiana advertencia que nos hacia y que si seguiamos llegando tarde, nos iba a despedir. El dia de viernes, el 5 de octubre, Richard Martin nos llamo a todos los trabajadores del Almacen y nos dijo en su oficina que estaba muy agradecido con la union por hacer el perdiera 5 clientes que esas 5 cuentas le daban a el 10% de su ganancia que gracias a los que trajeron a la union habia perdido todo ese 10%. Que como le habia perdido ese 10% el iba a sacar ese 10% y a la gente nueva les dijo que por 4 o 5 personas que estan con la union se nos dejeran convencer para firmar con la union ya que la union les habia ofrecido muchos beneficio y muchos millones de dolares y que ellos eran la mayoria y que la union no podria entrar.

14. Los ventiladores fueron puestos a funcionar una semana despues de la huelga. Los cuales producen mas frio de lo normal.

15. Cuando tu faltas un dia y no llamabas, te suspendia un dia y no le paga el dia de suspencio.

16. Piensan que es injusto porque el llegaba a su hora, cumplia su trabajo y era un buen trabajador. Puede ser por muchas cosas -una por el sindicato, otro por los ventiladores y el trabajo con los abogados.

17. Tenemos doble trabajo porque tenemos que enseñar a los nuevos trabajadores y hacer nuestro trabajo y hacer el trabajo de los nuevos.

18. Esta bien busy y no puedo salir antes de terminar el trabajo.

19. Hace dos semanas me esta pagando overtime.

Miguel Eduardo Tavara

Sworn to before me this ___ day of Oct 2007

Notary Public

Bruce A. Yerman
Notary Public, State of New York
No. 02YE5051510
Qualified in Nassau County
Commission Expires 2005/2007

Consulor A & V Caro
Peru
Nu # 4305 7492

# AFFIDAVIT OF BETH BALTIMORE

STATE OF NEW YORK            )
                             :
COUNTY OF KINGS              )

Beth Baltimore, being sworn, says:

I have volunteered to translate for David Rankin, Attorney at Law. I am fluent in Spanish and English. I have read the foregoing Spanish language document and the accompanying English language document, The Affidavit of Miguel Eduardo Tavara. The English document is a complete and accurate translation of the Spanish document.

_____
Beth Baltimore

Sworn to before me this
____ day of OCT. 2007

_____
Notary Public

PAULETTE M. THIELMAN
Notary Public, State of New York
No. 01TH5083638
Qualified in Kings County
Commission Expires July 28, ____

## AFFIDAVIT OF JOSE ANTONIO FERNANDEZ TAVARA

I, Jose Antonio Fernandez Tavara, promise to tell the truth, and this is what I testify:

1. My name is Jose Fernandez. I live at 97-19 Alsine, Queens, NY 11368.

2. I am working for Wild Edibles and I started in July 2002.

3. I am a filleter, I cut small fish and I also package it.

4. I am paid $338 in check and $137 in cash, $475 before taxes and I work around 47 to 51 hours.

5. I start work at 2 a.m. and I leave when the work finishes, but generally this is around 12 p.m. or 1 p.m. On Saturdays I work from 4 a.m. until 10 or 11 a.m.

6. When I started to work in 2002, they paid me $400. After one year, they paid me $425, after 2 years $450, and with the last raise, they paid me $450 and in addition to my check, they gave me $25.

7. Since I started working, they always paid me a weekly salary even thought I worked a different schedule.

8. I arrived at Wild Edibles on Monday, August 20 around 2:20 a.m. The previous Saturday, we met with Billy Randel in order to come to an agreement about how Monday's actions were going to happen. And like we had planned, we remained outside of Wild Edibles with posters and banners.

9. While we were outside Bobby, the boss in charge of those who buy fish for Wild Edibles, was talking with Billy Randel about how we did not have any right to be going on strike because we were undocumented.

10. Also while we were outside, Matteo, the other fish buyer, started to take our photos.

11. I was with our group and at about 3:30 a.m. I saw Richard Martin, the owner of Wild Edibles, come out to the street, smile and return to his office. At about 20 minutes he left again and Billy Randel, who was representing us, approached him and tried to speak with him, but Richard turned the other way and returned to his office. The workers that I remember being there were: Raul Lara, Pedro Hernandez, Eduardo Tavara, Raymundo Lara, Cesar Batruen, Julio Carbonel, Lino Alberto, Carlos Molina, Marcos, Jason Borges, Julio Cesar. Richard started to take the vans and we began to chant for our cause. Richard started to dance and smile jokingly.

12. At around 5:30 a.m. Richard Martin left and Billy presented him with our demands. Billy told him that we wanted overtime pay, no retaliation and for Raymundo to be reinstated.

13. I heard Richard Martin respond to Billy that he had nothing to discuss with him.

14. Richard Martin asked is why we were doing this because if there was a reason, according to him, he did not know anything. He started to point out that he had helped us so much economically and with permission to miss work. Also with his hands, he pointed out the favors he had done for each one of us. He looked at me, signaled to me and I approached. I stood at Billy's side and asked him to be my translator. I said to Richard that he had again been very abusive. Richard told me that he had been helping with money to bring to my brother to the country. He repeated this two more times. I said to Richard that I am very grateful for this. He asked me if this is the way to be grateful.

15. Richard Martin told us that we had until 6 a.m. to return to work but that he was not going to accept the 3 conditions we wanted.

16. At around 7:30 a.m. I saw Jason leave the office and after a moment he told me that he was no longer employed there.

17. The same day of the action, Agosto, Cesar Varturen, Jason and I entered the office and Richard started to speak with Jason. Jason left the office upset and he could not understand because he was speaking very fast. After, Richard spoke with me he returned to ask why we had done all this if he had given me money to bring to my brother. I responded that I was very grateful and that I went on strike because of the abuses that had occurred and also because of the schedule change and that on Saturdays, we were working for free and that it was also because of the new manager Roberto who was abusive and tyrannical. Richard said that he was going to speak with each one of us.

18. After about a week they fired Raul Lara. The general manager Roberto said to Luis Carbonel, the person in charge of us, that if Raul arrived to tell him that he no longer worked there and that Friday he could come to pick up his check. They said he was fired because he did not call to give notice that he was not going to come to work. But I believe that this is a pretext because he is the brother of Raymundo and was also at the action on August 20.

19. Before the action on August 20, myself and other workers had missed work without calling and were not fired. There had only been one occasion where they fired a worker for not coming to work because he did it 2 or 3 times a week. It was understood that when the workers were not coming to work it was because they were sleeping and it was not a reason to fire someone.

20. The rule had always been that if you do not come to work for 2 or 3 days and do not call, you were suspended. I was suspended 2 years ago. I believe that this was the first time that Raul did not call after being absent from work but they fired him.

21. Before the action, Richard Martin regarded Raul Lara highly.

22. I was working one Saturday at the end of August and Richard Martin arrived. This was rare because normally he does not work on Saturdays and he asked J.P. and also Carlos what had happened with Julio Cesar. J.P. told Richard that Julio Cesar had not arrived, Carlos did not know anything. Richard told Carlos to let Julio Cesar know that he was fired for not notifying him that he was not going to come to work. Julio Cesar was fired this day.

23. The public firing of Julio Cesar scared me and I felt some regret about the action. I thought about why I had participated in the action and it gave me doubt. When they started firing my colleagues at the action, they accused me of it being my fault that now they were being fired. I wanted to leave the case and many of my co-workers told me that they wanted to do the same. There were also co-workers that were not a part of the case because they were scared.

24. Before the action, the fans were turned on after we had finished working. About 4 weeks ago, they made Richie a manager, and he checks on everything that we do. Richard Martin and Richie started to turn on the fans while we were working. This is why the rooms are too cold. I think that this is a way of putting pressure on us so that we leave the job.

25. Since the action, Richard Martin has started to hire people. We have to teach them the job. This also makes me think that they are putting pressure on us to leave the job.

26. On Friday, September 14, I was cutting a tuna when Bobby came over to me and started to yell at me and insult me too. He told me that I was working slowly and that he had been notified. I felt very bad, stopped working and went to change thinking that I was going to quit because I could not take the great pressure. I was on the brink of quitting when my co-worker, Cesar Barturen told me that our Federal case was going to make things better at work and that I should not quit.

27. On Friday, October 5, Richard Martin called all of the workers in the building and told us in his office that he was very grateful for the union because it made him lose 5 clients and that these 5 clients made up 10% of his profits and that thanks to the work of the union he had lost this 10%. He said that because of how he had lost this 10% he was going to take 10%, and that he told the new people that for 4 or 5 people that are in the union, that they should not be convinced to sign with the union although the union had offered greater benefits and many millions of dollars and that they are the majority, and that the union could not enter.

28. On October 5, Richard Martin called me and my brother, Eduardo Tavara, into his office and to me, asked why was it that I had arrived late and I responded that it was only 2 or 5 minutes and Richard told me that this time was the first warning and the next time I would be fired.

29. On Saturday I went to work as usual. On Sunday I felt bad. I used my cell phone to call the only number I have for Wild Edibles at 10 at night and nobody answered. I left a message saying that I could not go to work on Monday because I felt bad. I felt some sort of doubt and I woke up at 5:20, called Wild Edibles from my house phone, and again, nobody answered. I left another message that I could not go to work because I felt bad and that I would go to work on Tuesday.

30. My brother, Eduardo Tavara, called my cell phone from his cell phone at 12 noon on Monday, October 8 and told me that the manager, Luis Carbonal, told him that on behalf of Richard, "Jose does not work here anymore and that he can come get his check on Friday.

31. In the past Richard did not fire anybody. It was always the manager that did the firings. I think this is an example of repression. Richard and the managers and the fish buyers are being repressive toward those who were at the protest on August 20. I think I was fired on account of my involvement with the union because Richard knew that I was one of the organizers.

## AFFIDAVIT OF JOSE ANTONIO FERNANDEZ TAVARA

STATE OF NEW YORK )

               : SS:

COUNTY OF NEW YORK )

Yo, Jose Fernandez, prometo decir la verdad, y esto es lo que testifico:

1. Mi nombre es Jose Fernandez. Yo vivo en el 97-19 de Alstine, Queens, 11368.

2. Yo estoy trabajando para Wild Edibles y empeze en Julio del 2002.

3. Yo soy fileteador corto pescado pequeño y tambien lo empaqo.

4. Me estan pagando $338 en cheque y $137 en cash, 475 antes de que quiten taxes, y trabajo como entre 47 y 51 horas.

5. Yo empiezo a trabajar a las 2 am y salgo hasta que el trabajo se acabe pero por lo regular es alrededor de las 12pm a 1pm. Los Sabados trabajo de las 4 am hasta las 10:00 am a 11:00 am.

6. Cuando empeze a trabajar en el 2002 me pagaban 400 dolares. Despues de un año me pagaban 425, despues de dos años 450, y con el ultimo aumento me pagan 450 y fuera de cheque me dan 25 dolares.

7. Desde que empeze a trabajar siempre me han pagado un salario semanal aunque he trabajado un diferente horario.

8. Yo llege un Lunes el 20 de Agosto como a las 2:20 am a Wild Edibles. El Sabado anterior nos juntamos con Billy Randel para quedar de acuerdo como las acciones del Lunes iban a suceder. Y como habiamos planeado, nos quedamos afuera de Wild Edibles con letreros y banderas.

9. Mientras estabamos afuera Bobby, el jcfe de los encargados de comprar pescado para Wild Edibles, estaba hablando con Billy Randel sobre como nosotro no teniamos ningun derecho para irons a huelga porque eramos indocumentados.

10. Tambien mientras estabamos afuera, Matteo el otro comprador de pescado, nos empezo a tomar fotos.

11. Yo estava con nuestro grupo y como a las 3:30 am yo vi a Richard Martin, dueño de Wild Edibles, salir a la calle, se sonrio, se regreso a su oficina. A los 20 minutos salio devuelta y Billy Randel representandonos se acerco a el y trato de hablar con el, pero Richard se dio la media vuelta y regreso a su oficina. Los trabajadores que recuerdo estar ahi son: Raul Lara, Pedro Hernandez, Eduardo Tavara, Raymundo Lara, Cesar Barturen, Julio Carbonel, Lino Alberto, Carlos Molina, Marcos, Jason Borges, Julio Cesar. Comenzo a sacar Richard los vans y nosotros comenzanos a hacer coros a favor de nuestra causa. Richard se puso a bailar y a reirse en forma de burla.

12. Como a las 5:30 am Richard Martin salio y Billy le presento nuestras 3 demandas. Billy le dijo que queriamos el pago de overtime, ninguna retaliacion, y el retorno de Raymundo a su puesto.

13. Yo oi que Richard Martin le respondio a Billy que no tenia nada que discutir con el.

14. Richard Martin nos pregunto a nosotros que porque le haciamos esto, porque era la razon, segun el no sabia nada. Comenzo a senalarnos que el nos habia ayudado, tanto como economicamente, y con permisos para faltar a trabajo. Tambien con la mano nos señalo a cada uno de nosotros los favores que el nos habia echo. Me vio a mi, mc senalo y yo me acerque. Me puse al lado de Billy y le pedi a Billy que fuera mi traductor. Le dije a Richard que se habia vuelto muy abusibo. Richard me dijo que porque le habia echo

esto si el me habia alludado con dinero para traer a mi hermano al paiz. Me repitio lo mismo dos vecez mas. Le dije a Richard que por eso estava agradecido. El me pregunto que si en esa forma yo le estava agradeciendo.

15. Richard Martin nos dijo que teniamos hasta las 6:00am para regresar a trabajar pero que no iba a aceptar las 3 condiciones que queriamos.

16. Como a las 7:30 am yo vi a Jason salir de la oficina y despues de un rato el me dijo que ya no iba a estar empleado ahi.

17. El mismo dia de la accion de Agosto, Cesar Varturen, Jason y yo entramos a la oficina y Richard comenzo a hablar con Jason. Jason salio molestro de su oficina y no pudo entenderlo porque esta hablando muy rapido. Despues, Richard hablo conmigo me volvio a decir que porque lo habia hecho pasado todo esto. Si el me habia ayudado dando me dinero para traer mi hermano. Yo le respondi, que le estaba muy agredecido y que hice la huelga por los abusos que estan han pasando y tambien le dije que fue por el cambio de horario, y que los dias Sabados estabamos trabajando gratis, y que tambien por su manager Roberto quien era abusibo y despota. Richard dijo que iba hablar con cada uno de nosotros.

18. Depues, masomenos, una semana despues despidieron a Raul Lara. El manager general Roberto le dijo al encargado de nosotro Luis Carbonel que si llegava Raul que le dijera que ya no trabajaba ahi y que el dia viernes podria recojer su cheque. Ellos dijeron que su despido era porque no llamo para avisar que no iba a llagar a trabajar. Pero yo creo que eso es un pretexto porque el es el hermano de Raymundo y tambien estuvo en la acion del 20 de Agosto.

19. Antes de la acion en Agosto 20, yo y otros trabajadores no nos presentabamos al trabajo sin llamar y no eramos despedidos. Solamente hubo una occasion donde despidieron a un trabajador por no presentarse al trabajo porque lo hacia 2 o 3 veces a la semana. Estaba entendido que cuando los trabajadores no llegaban a trabajar era porque estaban dormidos y no era cosa para despedir a uno.

20. La regla siempre habia sido de que si no llegabas al trabajo por 2 o 3 dias y no llamabas eras suspendido. Yo fui suspendido hace 2 anos. Yo creo que esta fue la primera vez que Raul no llamo despues de estar ausente al trabajo pero lo corrieron.

21. Antes de la accion Richard Martin tenia mucha estima hacia Rau Laral.

22. Yo estava trabajando un Sabado a fines de Agosto y Richard Martin llego. Esto era raro porque regularmente el no trabaja los Sabados y le pregunto a J.P. y tambien a Carlos que habia pasado con Julio Cesar. J.P. le dijo a Richard que Julio Cesar no habia llegado, Carlos no sabia nada. Richard le dijo a Carlos que le avisara a Julio Cesar que estava despedido por no haber avisado de que no iba a llegar al trabajo. Julio Cesar fue despedido ese dia.

23. El despedimiento publico de Julio Cesar me hiso sentier temor y algo arrenpentido sobre la accion. Pense sobre por que yo habia participado en la accion y me hiso dudar. Cuando empezaron los despidos todos mis compañeros de la accion me acusaban de que por mi culpa ahora ellos podian ser despedidos. Yo quize dejar el caso y muchos de mis companeros me dijeron que querian hacer lo mismo. Tambien hubo companeros que no se hicieron parte del caso por miedo.

24. Antes de la accion los ventiladores eran prendidos despues de que terminavamos de trabajar. Desde hace como 4 semanas atras, hicieron de Richie un manager, quien nos

chequea todo lo que hacemos. Por orden de Richard Martin y Richie empezaron a encender los ventiladores mientras nosotros estamos trabajando. Por esta razon los cuartos se ponen demasiado frio. Yo creo que esta es una manera de ponernos precion para que nosotros dejemos el trabajo.

25. Desde la accion, Richard Martin ha comenzado a contratar jente. Nosotros les tenemos que enseñar los deberes del trabajo. Tambien esto nos ha echo pensar que nos estan poniendo precion para que dejemos el trabajo.

26. El viernes 14 de Septiembre yo estava cortando tuna cuando Bobby se acerco y me empezo a gritar y insultar demasiado. Me dijo que estava trabajando muy lento y que le habian llamado la antencion a el. Yo me senti muy mal, deje de trabajar y me fui a cambiar pensando que iba a renunciar por no poder soportar tanta presion. Estaba a punto de renunciar cuando mi compañero Cesar Barturen me dijo que nuestro caso Federal hiba a mejorar las cosas en el trabajo y que no renunciara.

27. El dia de viernes, el 5 de octubre, Richard Martin nos llamo a todos los trabajadores del Almacen y nos dijo en su oficina que estaba muy agredecido con la union por hacer que el perdiera 5 clientes que esas 5 cuentas le daban a el 10% de su ganancia que gracias a los que trajeron a la union habia perdido todo ese 10%. Que como el hacia perdido ese 10% el iba a sacar ese 10% y a la gente nueva les dijo que por 4 o 5 personas que estan con la union que no se dejeran convencer para firmar con la union ya que la union les habia ofrecido muchos beneficio y muchos millones de dolares y que ellos eran la mayoria y que la union no podria entrar.

28. El 5 de octubre Richard Martin me llamó a su oficina a mi hermano, Eduardo Tavara y a mi y me reclamó cual era el porque estaba llegando tarde y lo le respondí que tan solo

era 2 a 5 minutos y Richard me dijó que esta vez era el primer aviso y que a la próximo me despedio.

29. El día sábado fui a trabajar normal. El domingo me sentía mal. Llamé por teléfono (de mi teléfno cellular) a la unico número que tengo por Wild Edibles a las diez de la noche y nadie me contestó. Dejé un mensaje diciendo que no podia ir al lunes a trabajar porque me sentía mal. Sentí algo de duda y me desperté a las 5:20 y llamé (de la teléfono de casa) a Wild Edibles otra vez y nadie me contestó. Dejé otro mensaje que no podia trabajar porque me sentía mal y que el martes iba a ir a trabajar.

30. Mi hermano, Eduardo Tavara, me llamó por su cellular (a mi cellular) a las 12 (noon) en el lunes, el 8 de octubre y me dijó que el manager, Luis Carbonal, le comunicó que de parte de Richard, "José ya no trabaja más y que el día viernes llcgar a cobrar su cheque."

31. El en pasado Richard nunca despedia a nadie. Siempre cra el manager que hacía los despedidos. Creo que es un ejemplo de represión. Richard y los managers y los que comprar pescado están tomando represaria contra los que estuviern el la protesta cn el 20 de agosto. Creo que fuí despedido por parte de mi involucrimiento con el sindicato porque Richard sabe que yo soy uno de los que organizo.

Sworn to before me this
15 day of Oct , 2007

José Antonio Fernandez Tavara

Passport ( Republica
Del Peru)
1005339

Bruce A. Yerman
Notary Public, State of New York
No. 02YE5531510
Qualified in Monroe County
Commission Expires 12/20/2009

**AFFIDAVIT OF BETH BALTIMORE**

**STATE OF NEW YORK**     )
                           :

**COUNTY OF KINGS**        )

      Beth Baltimore, being sworn, says:

      I have volunteered to translate for David Rankin, Attorney at Law.  I am fluent in Spanish and English. I have read the foregoing Spanish language document and the accompanying English language document, The Affidavit of Jose Antonio Fernandez Tavara.  The English document is a complete and accurate translation of the Spanish document.

                                _____
                                        Beth Baltimore

Sworn to before me this
_16_ day of _OCT._ 2007

Notary Public

PAULETTE M. THIELMAN
Notary Public, State of New York
No. 01TH5082638
Qualified in Kings County
Commission Expires July 28, 2009



David Rankin <davidbrankin@gmail.com>

## (no subject)
2 messages

**Thomas J. Bianco <tbianco@meltzerlippe.com>**                    **Mon, Oct 1, 2007 at 1:30 PM**
To: Davidbrankin@gmail.com
Cc: "Richard M. Howard" <rhoward@meltzerlippe.com>

> David, I have not heard back from you regarding the Lino Martinez issue..FYI the company
> received an OSHA complaint regarding the termperature of the coolers today.
>
> I want to bring you up to date on employee matters today----
>
> Two drivers again failed to call or come to work :
>
> Rodney B. Askins , abandoned his job after he was a "No Call – No Show" for his regularly
> scheduled shift on both Saturday and today
>
> Leonardo Flores abandoned his job today when he was again a "No Call –No Show" this
> morning after previously getting a final warning for same issue
>
>
>
>
>
> *Thomas J. Bianco, Esq.*
> *Meltzer, Lippe, Goldstein & Breitstone, LLP*
> *190 Willis Avenue*
> *Mineola, N.Y. 11501 (516) 747-0300 x178*
>
> This electronic message transmission contains information which is intended only for the use of the individual or entity to which it is
> addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of
> this message is not the intended recipient, you are hereby notified that any dissemination or distribution of this communication to other
> than the intended recipient is strictly prohibited. If you have received this communication in error, please notify us immediately by calling
> (516) 747-0300 or by electronic mail to HYPERLINK "BLOCKED::mailto:info@meltzerlippe.com). "info@meltzerlippe.com. Thank you.

**David Rankin <davidbrankin@gmail.com>**                    **Mon, Oct 1, 2007 at 1:45 PM**
To: "Thomas J. Bianco" <tbianco@meltzerlippe.com>
Cc: "Richard M. Howard" <rhoward@meltzerlippe.com>

Thomas:

Thank you for the update. I am awaiting the outcome of an interview before I can make an evaluation on the Martinez issue. I
trust we will speak tomorrow regarding our conversation on Wednesday with Judge.

As you no doubt know both from conversations with this office and other information, the employees regard the cooling fans as
a retaliatory action. Again, I do not have sufficient information to say much more about it. However, dealing with the fan issue
in a constructive way could easily go a long way in ameliorating the tension in this work place.

Best,
David

--
------

David B. Rankin
Attorney at Law
350 Broadway, Suite 700
New York, NY 10013

t:212-226-4507
f:212-658-9480

This message may contain privileged material. If you are not the intended recipient, please return it.
[Quoted text hidden]

INTERNET
FORM NLRB-501
(0-07)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

FORM EXEMPT UNDER 44 U.S.C 3512

**DO NOT WRITE IN THIS SPACE**

| Case | Date Filed |
|---|---|
| 29-CA-28497 | 8/27/2007 |

**INSTRUCTIONS:**
File an original together with four copies and a copy for each additional charged party named in item 1 with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

### 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer | | b. Number of workers employed |
|---|---|---|
| Wild Edibles | | 50 /30 - 35 |

| c. Address (Street, city, state, and ZIP code) | d. Employer Representative | e. Telephone No. |
|---|---|---|
| 21-51 Borden Ave. Long Island City, NY 11101 | Richard Martin | 718-433-4321 Fax No. |

| f. Type of Establishment (factory, mine, wholesaler, etc.) | g. Identify principal product or service |
|---|---|
| Wholesaler | Seafood |

h. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and (list subsections) (3) _____ of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge (set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)

Wild Edibles, (the "Employer"), has violated the Act by:

1) Firing employee Jason Borges on August 20, 2007, a few hours after he and other employees informed the Employer that they had joined the Industrial Workers of the World.

2) Expressing the futility of supporting the Union by stating, inter alia, "they can't join the union, they're illegal;" "I hate unions, unions are disgusting, no union here;" and "I'll never talk to the union only individuals."

3) Soliciting grievances by asking employees what went wrong in order to discourage unionization.

4) Promising individual meetings to address those grievances in order to discourage unionization.

5) Promising employees extra pay at the end of the week in order to discourage unionization.

6) On August 10, 2007, firing employee Reymundo Losa upon identifying him as a potential union supporter in retaliation for that support.

The Employer engaged in the above described conduct because of the protected concerted activities of its employees.

3. Full name of party filing charge (if labor organization, give full name, including local name and number)
Industrial Workers of the World- Industrial Union 460/640

| 4a. Address (Street and number, city, state, and ZIP code) | 4b. Telephone No. |
|---|---|
| IWW IU 460/640 c/o Teamsters Local 805 44-61 11th Street 3rd Floor Long Island City, NY 11101 | 646-645-6284 Fax No. 917-591-6128 |

5. Full name of national or international labor organization of which it is an affiliate or constituent unit (to be filled in when charge is filed by a labor organization) Industrial Workers of the World

### 6. DECLARATION

By I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.
(signature of representative or person making charge)

Address 44-61 11th Street 3rd Floor Long Island City, NY 11101

REPRESENTATIVE
(Print/type name and title or office, if any)

(fax) 917-591-6128
646-645-6284
(Telephone No.)

08/22/2007
(date)

WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)

FORM EXEMPT UNDER 44 U.S.C 3512

| INTERNET FORM NLRB-508 (8-07) | UNITED STATES OF AMERICA<br>NATIONAL LABOR RELATIONS BOARD<br>**CHARGE AGAINST LABOR ORGANIZATIONS**<br>**OR ITS AGENTS** | DO NOT WRITE IN THIS SPACE | |
|---|---|---|---|
| | | Case | Date Filed |

**INSTRUCTIONS:** File an original together with four copies and a copy for each additional charged party named In Item 1 with NLRB Regional Director for the region In which the alleged unfair labor practice occurred or is occurring.

**1. LABOR ORGANIZATION OR ITS AGENTS AGAINST WHICH CHARGE IS BROUGHT**

a. Name

Industrial Workers of the World International Union 460/640

b. Union Representative to contact

Daniel Gross

c. Telephone No.
646 645-6284
Fax No.
917 591-6128

d. Address *(Street, city, state, and ZIP code)*
44-61 11th Street, 3rd Floor Long Island City, N.Y. 11101

e. The above-named organization(s) or Its agents has (have) engaged in and is (are) engaging in unfair labor practices within the meaning of section 8(b), subsection(s) *(list subsections)* 8(b)(4)ii(B) of the National Labor Relations Act, and these unfair labor practices are unfair practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

Since on or about July 1, 2007 the above named labor organization, by and through its agents has threatened, coerced and restrained persons engaged in commerce or in an industry affecting commerce,including Balthazar Restaurant Group, where the object thereof is to force or require such persons to cease using, selling, handling, transporting, or otherwise dealing in the products of Wild Edibles and to cease doing business with Wild Edibles and to force or require Wild Edibles to recognize or bargain with IWWIU 460/640 as the representative of its employees where such labor organization has not been certified as the representative of such employees. Charging Party requests injunctive relief pursuant to Section 10(j) of the Act and a broad remedial order.

| 3. Name of Employer<br>Wild Edibles, Inc. | 4. Telephone No.<br>718 433-4321 |
|---|---|
| | Fax No. 718 433-4316 |

| 5. Location of plant involved *(street, city, state and ZIP code)*<br>21-51 Borden Avenue, Long Island City, N.Y. 11101 | 6. Employer representative to contact<br>Richard Martin |
|---|---|

| 7. Type of establishment *(factory, mine, wholesaler, etc.)*<br>Wholesale production | 8. Identify principal product or service<br>seafood | 9. Number of workers employed<br>40 |
|---|---|---|

10. Full name of party filing charge
Wild Edibles, Inc.

| 11. Address of party filing charge *(street, city, state and ZIP code.)*<br>21-51 Borden Avenue, Long Island City, N.Y. 11101 | 12. Telephone No.<br>718 433-4321<br>Fax No. 718 433-4316 |
|---|---|

**13. DECLARATION**

I declare that I have read the above charge and that the statements therein are true to the best of my knowledge and belief.

By _____
*(signature of representative or person making charge)*

Attorney
*(Print/type name and title or office, if any)*

Address  Meltzer, Lippe, Goldstein & Breitstone, LLP
190 Willis Avenue, Mineola, N.Y. 11501

(Fax) 516 237-2893
516 747-0300 x178          9/12/07
*(Telephone No.)*          *(date)*

WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)

## AFFIDAVIT OF CESAR BARTUREN

**County of New York**      )

**State of New York**       )

### I, Cesar Barturen, being first duly sworn upon my oath, hereby state as follows:

1. I reside at 32-26 48th Street Apt. 1R, Long Island City, New York 11103.

2. I was born Chiclayo, Peru. I came to the United States in 1987.

3. I began working for Wild Edibles around July of 1998.

4. When I began working, I worked at the Wild Edibles warehouse on Elizabeth Street in Manhattan. The warehouse had a retail section where I worked cutting and selling fish to customers.

5. After working for five or six months I moved to the Grand Central retail location. I would pick up fish from the warehouse and bring it to Grand Central. At Grand Central I would cut and sell fish.

6. At that time I was working from 5 a.m. to 3 p.m. Monday to Friday. On Saturday I worked from 8 a.m. to 1 p.m. At that time I was paid by about $420 a week, before taxes. I was paid by check.

7. Around 2001 I was given a raise to $500, but I also had to start making deliveries after the retail store closed, working until 4 or 5 o'clock.

8. About two and a half years ago the owners of Wild Edibles, Jonathan Meyer and Richard Martin, had a falling out. Richard Martin told me I would work for him. He paid me $600 by check. After taxes the check would be for around $450, but he would pay me cash to bring the amount up to $500 a week.

9. Since I began working only for Mr. Martin my job consists of picking up a load of fish at the warehouse at 2151 Boerum Avenue in Long Island City. I arrive at the warehouse at 3 a.m. and leave around 9 a.m. I then deliver fish to retail locations, Grand Central, 535 Third Ave., and the location on Adams Street in Brooklyn. As of last week I also deliver to a new retail location on 45th Street between Second and Third Avenue.

10. I work Monday to Friday from 3 a.m. till around 1 p.m.

11. Wild Edibles is not a very good workplace for myself and many of the workers. Managers treat the Hispanic workers with a lack of respect. They are yelled at and they get fish thrown at them.

12. To my knowledge all of the managers at Wild Edibles are white. I do not believe that any of the Hispanic workers have an opportunity to become managers or to advance within the company.

13. I first came in contact with the union on August 20, 2007, as they were staging a demonstration in front of the warehouse. I spoke to several of the union organizers and decided to join in their demands.

14. I wanted to join the union to get paid for the hours I worked, to get paid overtime, and to not have racial discrimination at the workplace.

15. The day of our demands for overtime Richard Martin asked me why I made demands. Richard Martin told me if he wanted he could fire me right then. He claimed that the man who did my job while I was on vacation could do my job better than I could.

15. The day after our labor demands a man, who joined in the demands, whose name I do not recall was, was fired.

16. Two days later, the Friday after the strike, Raul Molina, who joined in the demands, was fired. Raul had never had problems at work before.

17. Three days later Julio Cesar, who joined in the demands, was fired.

18. It is well know at the warehouse that all three of these workers were fired for making labor demands.

19. Since making labor demands I have received negative treatment at work.

20. Before our labor demands a worker would help me load the truck with fish at the warehouse. Loading the truck involves a lot of heavy lifting. The loads are often over one hundred pounds each. Since we made our demands I have been forced to load the truck without help, because of this I experience frequent back pain.

21. Previously when I made deliveries to the retail location someone would come out to help me unload the fish. I no longer receive any assistance in unloading fish. Additionally none of the workers at the retail locations will speak with me any longer.

22. Since making demands my truck is the last to be checked so that I cannot leave the warehouse. This causes me to work longer hours.

23. Workers who have made union demands are told by managers that they are lazy and bad workers. I was told that I am slow and that customers don't like me.

24. Workers are afraid to join the union because of the treatment of workers who are perceived as supporting the labor demands.

25. I am worried that I might be fired because of my participation the lawsuit, and in demanding overtime pay.

Cesar Barturen

Sworn to before me this
15th day of September, 2007

Notary Public

JOHANNA CONDE
Notary Public, State of New York
No. 01CO6159907
Qualified in Queens County
·COMMISSION EXPIRES 01/29/2011